No. 2--08--0821     Filed: 12-29-09

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| RICHARD DORIA, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 07--L--92 |
| | ) | |
| THE VILLAGE OF DOWNERS GROVE, | ) | |
| | ) | |
| Defendant-Appellee | ) | Honorable |
| | ) | Stephen J. Culliton, |
| (The County of Du Page, Defendant). | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiff, Richard Doria, appeals the circuit court's order granting summary judgment in favor of defendant, the Village of Downers Grove, on plaintiff's complaint seeking to hold defendant liable for the allegedly defective condition of the convergence of a gravel area and roadway on which plaintiff fell. On appeal, plaintiff argues that the trial court allowed defendant to introduce a defective affidavit into evidence and that the trial court erred in concluding that defendant was not liable pursuant to section 3--102(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/3--102(a) (West 2006)). For the reasons that follow, we affirm.

In his complaint, plaintiff alleged that, in January 2006, he fell in an area maintained by defendant; he alleged that the fall came as a result of a four-inch difference in elevation between the gravel area and the adjoining street. Plaintiff sought to hold defendant liable for its failure to warn

him of, protect him from, or correct the alleged defect. (Plaintiff also brought a claim against the County of Du Page, but that claim was later dismissed.) Later evidence, including deposition testimony and photographs, indicated that plaintiff fell near a store building at the corner of Ogden Avenue and Washington Street. From a vantage point looking from Ogden Avenue at the front door of the store with Washington Street to the right of the store, one would have seen the gravel lot to the right of the store, between Washington Street and a sidewalk running along the side of the store. The areas behind the store and to the left of the store were paved and bore yellow painted lines to indicate parking spots. There were no signs in either the paved lots or the gravel lot indicating that parking was allowed or not allowed on those areas. The gravel lot had no paint to indicate parking spots but did have a single concrete parking bumper placed between the lot and the building (the bumper appeared to be placed so that it was nearly touching the building, and it did not span the full length of the gravel lot).

In its motion for summary judgment, defendant argued, among other things, that it was not liable under the Act because plaintiff, who was using the area as a parking lot at the time of his injury, was not an intended user of the area. Defendant attached to its motion for summary judgment an affidavit and transcripts of four depositions.

In the affidavit, Dorin Fera stated that he was the traffic engineering manager for defendant and that his job duties included "determining the intended use of various property" within Downers Grove "and the need, location, placement, and installation of signage" for property in Downers Grove. Fera noted that the lot in question in this case had been unpaved for "the past 20 years" and that defendant had never placed parking meters, "public parking" signs, concrete parking bumpers, or painted yellow parking lines in the lot. He said that defendant never had intended that the lot be

used as a parking lot, and he offered that "[i]t is neither feasible nor practical for [defendant] to erect 'No Parking' Signs on every piece of Village property it does not intend" be used for parking.

In the first deposition, plaintiff stated that he fell while removing a package from his car, which he had parked in the gravel lot located to the side of the store. Plaintiff recalled that he parked his car, which he said was approximately 20 feet long, at a 30-degree angle in the gravel area between the store and Washington Street. Plaintiff said that he then took a package from the trunk of his car, took one step backwards, and fell when the heel of his shoe caught on the lip of the road, which was higher than the gravel area. He said that there was another car parked in the gravel lot at the time he fell, and he further stated that he had never seen any customers parked in the paved lot on the other side of the store and rarely saw customers parked in the lot behind the store.

In the second deposition, John Provenzale, plaintiff's stepson, described the height differential between the gravel lot and the adjoining street and also testified regarding the effects of plaintiff's injury.

In the third deposition, Officer James Edwards of the Downers Grove police department recalled that he responded to the call about plaintiff's fall. He said that he saw plaintiff after plaintiff's injury, and he described the area of the fall. He also stated that it would be an ordinance violation for a car parked on the gravel lot to encroach the sidewalk running along the building. Edwards further agreed that he had seen cars parked in the gravel lot but had never issued parking tickets to the owners of those cars.

In the fourth deposition, Richard Ebel, who for the previous 12 years had been a street division manager for the Downers Grove department of public works, stated that, after plaintiff's fall, he directed workers to add gravel to the gravel lot to decrease the difference in elevation between it

and the street. (He left the gravel lot at a slightly lower elevation in order to avoid snow plows disturbing it while plowing Washington Street, and he explained that the gravel lot was originally set at a lower elevation for that same reason.) Ebel said that his department was responsible for distributing concrete parking bumpers and that no bumper was issued for the gravel lot. Ebel explained that defendant placed the bumpers "only on Village parking lots and designated parking" and that the gravel lot was "not a designated parking area by the Village." Ebel stated that he did not know who had placed the bumper on the gravel lot but noted that many businesses had created their own parking areas and that "code enforcement doesn't enforce the no parking." Ebel said that he had been aware of customers parking in the gravel lot. According to Ebel, the paved lots with painted parking spots were the intended parking areas for the store, and the gravel lot was not intended as a parking area. Ebel explained that, "[i]f it was intended, it would have been upgraded to asphalt and parking bumpers installed, striped and also signs."

After hearing argument from the parties, the trial court granted summary judgment to defendant on the ground that defendant did not intend for the gravel lot to be used as a parking area and thus defendant was not liable under section 3--102(a) of the Act. Plaintiff timely appeals.

As a threshold matter, plaintiff objects to two pages of defendant's appellate brief containing a picture and a drawing not otherwise part of the record on appeal. We agree with plaintiff that we may not consider as evidence any items that are not included in the record on appeal, and we followed that principle in our review of defendant's brief.

Plaintiff's first argument is that the trial court erred in considering the affidavit from Dorin Fera, because, according to plaintiff, it violated Supreme Court Rule 191 (210 Ill. 2d R. 191). Rule 191 provides that "[a]ffidavits in support of and in opposition to a motion for summary judgment ***

shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; *** shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." 210 Ill. 2d R. 191.

Plaintiff argues that Fera's affidavit violated Rule 191 in two ways. First, plaintiff argues that the affidavit failed the personal knowledge requirement; plaintiff asserts that "no facts were included as to the length of time Fera has worked for [defendant]." Indeed, plaintiff is correct that Fera's affidavit states only that he was defendant's traffic engineering manager, not how long he had held that position. However, "[i]f, from the document as a whole, it appears that the affidavit is based upon the personal knowledge of the affiant and there is a reasonable inference that the affiant could competently testify to its contents at trial, Rule 191 is satisfied." Kugler v. Southmark Realty Partners III, 309 Ill. App. 3d 790, 795 (1999). From Fera's statement that he held the traffic engineering manager position, along with his statement that he was charged with "determining the intended use of various property *** and the need, location, placement, and installation of signage," it can reasonably be inferred that his conclusion that the gravel lot was not intended for parking was based on personal knowledge.

Plaintiff's second basis for arguing that Fera's affidavit violated Rule 191 is his argument that the statements in the affidavit were impermissibly conclusory. We disagree. Although Fera's affidavit did contain a conclusion--it stated that defendant never intended that the gravel lot be used for parking--it also listed the facts from which Fera drew that conclusion (the unpaved and unmarked nature of the lot) and stated that Fera's job required that he draw such conclusions. Plaintiff argues that, even so, an affidavit that asserts an opinion must qualify as expert testimony (Protective

Insurance Co. v. Coleman, 144 Ill. App. 3d 682, 687 (1986)), and he contends that the conclusion Fera drew was not a matter properly subject to expert testimony. However, plaintiff's argument on this point is itself conclusory: he offers no reason why Fera should not be considered qualified to render an opinion regarding the intended use of the gravel lot. We therefore reject plaintiff's argument that the trial court should have stricken the Fera affidavit.

Plaintiff's second argument is that the trial court erred in granting summary judgment to defendant. Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2--1005(c) (West 2006). "The function of a reviewing court on appeal from a grant of summary judgment is limited to determining whether the trial court correctly concluded that no genuine issue of material fact was raised and, if none was raised, whether judgment as a matter of law was correctly entered." American Family Mutual Insurance Co. v. Page, 366 Ill. App. 3d 1112, 1115 (2006). "The propriety of a trial court's decision to grant summary judgment presents a question of law, which we review de novo." Bigelow Group, Inc. v. Rickert, 377 Ill. App. 3d 165, 168 (2007).

In order to succeed on a cause of action for negligence, a plaintiff must establish that the defendant owed a duty of care, that the defendant breached that duty, and that the plaintiff suffered an injury proximately caused by the breach of duty. Curatola v. Village of Niles, 154 Ill. 2d 201, 207 (1993). The question here is whether defendant owed plaintiff a duty to maintain the gravel lot. The parties agree that the scope of defendant's duty is controlled by section 3--102(a) of the Act. See Curatola, 154 Ill. 2d at 207 ("A local governmental entity's duty is limited by the language of section 3--102(a) of the Act"). Section 3--102(a) provides as follows, in pertinent part:

"[A] local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times it was reasonably foreseeable that it would be used ***." 745 ILCS 10/3--102(a) (West 2006).

"Section 3--102(a) of the Act only imposes a duty of ordinary care on municipalities to maintain property for uses that are both permitted and intended." (Emphases in original.) Vaughn v. City of West Frankfort, 166 Ill. 2d 155, 160 (1995). The parties agree that plaintiff's use of the gravel lot was permitted; their dispute centers on whether defendant "intended" plaintiff's use of the lot.

Although there is no universal test for determining a local governmental entity's intent under these circumstances, supreme court jurisprudence has developed to hold that "[w]hether a particular use of property was permitted and intended is determined by looking to the nature of the property itself." Vaughn, 166 Ill. 2d at 162-63; see Boub v. Township of Wayne, 183 Ill. 2d 520, 525 (1998) (quoting Vaughn).

For example, in Wojdyla v. City of Park Ridge, 148 Ill. 2d 417 (1992), the supreme court case that appears to have given genesis to the rule, the plaintiff's husband was killed after he was hit by a car while crossing a highway that the plaintiff alleged the City of Park Ridge had not properly lit. The supreme court noted that the husband had crossed "midway between two T-intersections, while the nearest painted crosswalk was approximately one-half mile in either direction" and that "[t]here were no signs or markings at the point where the decedent crossed that indicated it was safe to cross the highway." Wojdyla, 148 Ill. 2d at 420. The supreme court stated that, "[t]o determine the intended use of the property involved" in Wojdyla, it "need[ed] look no further than the property itself"

(Wojdyla, 148 Ill. 2d at 426). The supreme court noted that "[t]he roads [were] paved, marked and regulated by traffic signs and signals for the benefit of automobiles" and that "[p]edestrian walkways [were] designated by painted crosswalks by design, and by intersections by custom." Wojdyla, 148 Ill. 2d at 426. The supreme court thus concluded that, even though pedestrians might be permitted to cross the street mid-block, "[m]arked or unmarked crosswalks are intended for the protection of pedestrians crossing streets, and municipalities are charged with liability for those areas," not for "a highway in mid-block." Wojdyla, 148 Ill. 2d at 426. Based on this reasoning, the supreme court held that the trial court properly granted summary judgment to the defendant.

In another case, Sisk v. Williamson County, 167 Ill. 2d 343 (1995), the plaintiff alleged that he struck a concrete bridge inadvertently with his vehicle, exited the vehicle to examine the damage, and fell from what he said was the visually obscured edge of the bridge and into the creek below. Sisk, 167 Ill. 2d at 346. To reach its conclusion that the plaintiff was not an intended user of the bridge and thus that the trial court had properly dismissed the plaintiff's complaint, the supreme court looked to the nature of the bridge:

"[T]here are no *** manifestations to indicate that [the local governing entity] intended pedestrians to walk on its country roads, much less the specific road and bridge complained of by plaintiff in the case at bar. *** [T]here are no walkways or crosswalks on rural country roads such as the county-line road in this case. Further, many country roads are gravel roads and often have no shoulder. We believe that the inference to be drawn from these facts, if any, is that municipalities do not intend that pedestrians walk on rural country roads. Although it may become necessary at times for pedestrians to walk on country roads, such

use is not a manifestation of the local municipality's intent that pedestrians walk on its country roads ***." Sisk, 167 Ill. 2d at 351-52.

In Boub, according to the plaintiff's complaint, he was injured riding his bicycle over a one-lane bridge with a wood-planked surface; he was thrown from his bicycle when his front tire stuck between two of the planks. Boub, 183 Ill. 2d at 522. The supreme court cited the rule that it could determine by looking at the property itself whether a plaintiff's use of the property was permitted or intended (Boub, 183 Ill. 2d at 525) before concluding that the nature of the bridge, which bore no indications "that would suggest that it was intended for use by bicycles" (Boub, 183 Ill. 2d at 528), demonstrated that the plaintiff was not an intended user. The court therefore affirmed the trial court's decision to grant summary judgment to the defendant.

In this case, under the above-described method for determining intent by looking at the property itself, all of the evidence indicates that the gravel lot was not intended to be used as a parking lot. The area was unpaved and unmarked and, even more tellingly, was located near two paved, marked parking areas. Although plaintiff emphasizes that there was no "no parking" sign on the lot, the evidence was undisputed that defendant was not in the practice of placing "no parking" signs on every lot it did not intend as a parking lot. Further, although the evidence showed that there was a parking bumper in the lot, the evidence was undisputed that defendant did not place it there. Also, both Fera and Ebel stated that the characteristics of the lot indicated that it was not intended for parking. In short, our examination of the evidence regarding the property itself reveals no indications that it was intended as a parking lot.

In support of his contrary position, plaintiff directs us to a line of cases built upon the Third District's decision in Di Domenico v. Village of Romeoville, 171 Ill. App. 3d 293 (1988). In

Di Domenico, the plaintiff "was lawfully parked parallel to the curb" on a street when, "while walking on the street to his car for the purpose of obtaining some items from its trunk, [he] fell into a hole and injured himself." Di Domenico, 171 Ill. App. 3d at 294. On appeal, the court concluded that the trial court had erred in dismissing the plaintiff's claim, because the plaintiff's use of the road was in fact intended and permitted under section 3--102(a) of the Act. The court reasoned as follows:

"[T]he defendant Village permitted curbside parking on Garland Street, so it must have recognized the necessity of pedestrians walking in the street and using a portion of it as a pathway, as a means of ingress and egress to and from their vehicles. It is common knowledge that, unless parking is specifically prohibited on a street, the operators of vehicles regularly and customarily, both in business districts and residential areas, park their vehicles either parallel to or at an angle to the curb. It defies common sense to conclude that such local entities did not contemplate and intend that the operator of the vehicle along with passengers would use the street area around the parked vehicle for ingress and egress to and from their vehicle." Di Domenico, 171 Ill. App. 3d at 295-96.

As plaintiff reads it, Di Domenico stands for the proposition that, if a local governmental entity permits parking in an area, it must recognize the necessity of, and thus intend, pedestrian use of the area for ingress and egress to and from vehicles parked there. Indeed, the above-quoted passage can quite easily be read as plaintiff suggests. However, there are two problems with this reading.

First, by arguing that a use must be intended solely because it is concomitant to a permitted use, plaintiff would erase any distinction between "permitted" and "intended" uses, even though the supreme court has emphasized that a plaintiff's use must meet both criteria in order to fit within

-10-

section 3--102(a) of the Act. See Boub, 183 Ill. 2d at 524 ("[i]n truth, an intended user of property is, by definition, also a permitted user; a permitted user of property, however, is not necessarily an intended user"); Sisk, 167 Ill. 2d at 349 ("the appellate court apparently failed to recognize the difference between 'permitted' and 'intended' uses under section 3--102 of the Act"); Vaughn, 166 Ill. 2d at 160 ("Section 3--102(a) of the Act only imposes a duty *** for uses that are both permitted and intended" (emphases in original)).

Second, there is a critical factual distinction between this case and Di Domenico: although it referred superficially to street parking as a "permitted" use of the area, the court in Di Domenico emphasized the idea that, because street parking is so customary, the governmental entity responsible for the street must have known at all relevant times that motorists would use the street for parking. Thus, the defendant's decision to build the street (and maintain the street) while still allowing parking must have indicated an intent to allow parking, and that intent to allow parking must have encompassed an intent to allow motorists to leave their vehicles on foot. Here, by contrast, the lot in which plaintiff parked was not paved and was not part of a street of the type that "[i]t is common knowledge that, unless parking is specifically prohibited ***, the operators of vehicles regularly and customarily" use for parking. Di Domenico, 171 Ill. App. 3d at 295. For this reason, we do not interpret the holding in Di Domenico as extending to this case. We instead interpret the holding as based on, and therefore limited to, customs and circumstances unique to paved public streets.

Plaintiff also directs to several cases that cite Di Domenico. In one of those cases, Curatola, the supreme court concluded that the trial court erred in entering summary judgment against a plaintiff who injured himself after tripping on a pothole as he was trying to return to a truck he had parallel parked on a public street. Curatola, 154 Ill. 2d at 204. The supreme court cited the "general

principle that a municipality owes no duty of care to a pedestrian who walks in or crosses a public roadway outside a crosswalk" (Curatola, 154 Ill. 2d at 208) before noting "[o]ne exception to the general principle *** recognized in" Di Domenico, namely Di Domenico's exception for pedestrians leaving or returning to their parked cars (Curatola, 154 Ill. 2d at 210). After citing these rules and reasoning that "indicators of parking," such as "[p]arking lanes *** designated by signs and meters or painted blocks on the pavement," "are not designed exclusively for interpretation by drivers who remain seated in their vehicles" (Curatola, 154 Ill. 2d at 211), the supreme court concluded that the plaintiff was engaging in an intended use of the street when he was injured. In so doing, the supreme court endorsed the holding in Di Domenico.

We read Curatola in the same way we read Di Domenico. Although it refers to street parking as a "permitted" use and pedestrian ingress and egress to and from cars as an accompanying "intended" use, we understand its reasoning to be that, in the context of street parking, which, as discussed in Di Domenico, is customary and expected on paved streets unless expressly prohibited, the fact that a governmental entity permits street parking indicates that it intended street parking, along with the accompanying pedestrian ingress and egress to and from parked vehicles. Indeed, in describing the scope of its own holding, the supreme court in Curatola offered a caveat that reflects our reading of the case:

> "[W]e do not hold that every pedestrian use of the street which is necessary to a
> permitted use of the street is itself both permitted and intended. Nor do we hold that
> necessity alone is the measure of whether such use is intended. [Citation.] The narrow
> exception we recognize here concerns only the permitted and intended use of the street

immediately around a legally parked vehicle by its exiting and entering operators and occupants." Curatola, 154 Ill. 2d at 213.

Again, because it is not "common knowledge that, unless parking is specifically prohibited ***, the operators of vehicles regularly and customarily" (Di Domenico, 171 Ill. App. 3d at 295) park in gravel lots of the type at issue here, as opposed to paved streets of the type at issue in Curatola and Di Domenico, we do not read those cases as controlling here. In other words, we read Curatola and Di Domenico as equating permission to park on streets with intent that streets be used for parking due to customs pertaining only to streets, as described in both cases. This custom does not extend to the type of gravel lot at issue here.

The notion of custom helping to determine what a governmental entity must have intended brings us to a related point raised in plaintiff's brief. Plaintiff argues that, even if our examination of the nature of the gravel lot (and surrounding area) itself does not reveal any indications that defendant intended it to be used for parking, we should also consider the "historical use" of the property as an indicator of defendant's intent. To support his suggestion that we consult the "historical use" of the property at issue here, plaintiff refers us to two cases: Marshall v. City of Centralia, 143 Ill. 2d 1 (1991), and Brooks v. City of Peoria, 305 Ill. App. 3d 806 (1999). In Marshall, the supreme court held that a parkway near a sidewalk was intended for limited pedestrian use; in so holding, the court stated that "parkways have historically been used by pedestrians in a number of limited instances." Marshall, 143 Ill. 2d at 10. In Brooks, the court cited Marhsall for the proposition that "historical and customary use" could be "relevant factors in determining" whether sidewalks were intended to be used by children riding bicycles, and it concluded that "evidence of historical and customary use

of sidewalks by children on bicycles to avoid the hazards of vehicular traffic" was "compelling proof that an infant bicyclist [was] an intended user of the sidewalk." Brooks, 305 Ill. App. 3d at 810.

Defendant raises some dispute as to whether "historical use" is a proper consideration for a court working to determine a governmental entity's intent for a property, and, indeed, reasoning in supreme court cases postdating Marshall does cast doubt on "historical use" as an indicator of a governmental entity's intent under section 3--102(a) of the Act. In Sisk, the case in which the plaintiff fell from a bridge while trying to inspect damage to his vehicle, the supreme court rejected the idea that common pedestrian usage of rural roads could indicate that pedestrian use was intended on such roads. The supreme court explained as follows:

"The [underlying appellate court decision in Sisk] noted that rural country roads are commonly used by persons other than drivers of automobiles, listing such uses as horseback riding, bicycling, jogging, walking and driving farm equipment. [Citations.] However, most of the activities listed are also common uses of city and residential streets. Illinois courts have concluded that although pedestrians may be permitted users, they are not intended users of streets outside marked crosswalks or other areas designated and intended for the protection of pedestrians." Sisk, 167 Ill. 2d at 349.

In Khalil v. City of Chicago, 283 Ill. App. 3d 161 (1996), the appellate court cited the above passage to reject an argument that common usage of alleys for purposes other than vehicular traffic indicated that the plaintiff pedestrian was an intended user of an alleyway in which he was injured. Khalil, 283 Ill. App. 3d at 164, citing Sisk, 167 Ill. 2d at 349-50. The court held that "even frequent use by pedestrians cannot convert the alley into a sidewalk." Khalil, 283 Ill. App. 3d at 164.

However, in Boub, an even later supreme court case that postdates Khalil and Sisk, the supreme court declined to repudiate Marshall's reliance on "historical use" to help determine whether a use was intended under section 3--102(a) of the Act. The supreme court explained that it did "not construe Marshall as establishing that historical practice alone is sufficient to make a particular use of public property an intended one." Boub, 183 Ill. 2d at 531. Instead, the supreme court said, "[r]ather than establish historical practice as the touchstone by which intended use must be measured, the Marhsall court simply referred to historical practice in attempting to ascertain the intended use, if any, of parkways." Boub, 183 Ill. 2d at 532. That said, although the supreme court did not repudiate Marshall, neither did it follow it. Instead, based on both the reasoning in Sisk and the idea that "a broad range of permitted uses *** is compatible with" only one intended use, it rejected the plaintiff's argument that customary and traditional use of county roads by bicyclists indicated intent that bicyclists use a particular county road. See Boub, 183 Ill. 2d at 532.

We cannot fully reconcile all of the above cases' treatment of the idea of "historical use" as it relates to determining intent under section 3--102(a) of the Act. Marshall appeared to espouse the idea that the historical and customary use of a type of property can help determine a governmental entity's intent for that property. This notion is very consistent with the above-discussed idea that, given the custom of motorists using paved roads for street parking, a governmental entity that allows street parking must also intend it. In fact, although it has never been stated in these terms, this street parking rule seems no more than an application of Marshall's "historical use" rule. Cf. Di Dominico, 171 Ill. App. 3d at 295 ("It is common knowledge that *** operators of vehicles regularly and customarily *** park their vehicles" on the street). As we understand Marshall, the supreme court relied on "historical use" for the narrow purpose of elucidating the intent underlying a piece of

property--just as a public body that is aware of the custom of street parking likely intends street parking if it does not prevent it, a public body that is aware of a different historical use of another type of property (for example, limited pedestrian use of parkways) but does not prevent it likely intends it.

This narrow purpose necessarily limits the scope of "historical use" considerations to those that pertained to the general class of property (i.e., roads, bridges, sidewalks, parkways) at the time the relevant governing entity formed or manifested its intent. Thus, a showing that a particular piece of property has been put to a particular use does not detail the type of "historical use" that Marshall relied on to help elucidate the intent underlying the property. Further, were the actual use of a particular piece of property allowed to stand as evidence of intent, then the fact that a use was or is permitted would become evidence that it was intended in the first place, and the statutory distinction between "permitted" and "intended" uses would vanish.

Understood in the narrow terms that Marshall seems to have intended, the "historical use" rule also comports with the oft-stated edict that a court "need look no further than the property itself to determine the municipality's manifestations of intent with regard to the use of the property." E.g., Sisk, 167 Ill. 2d at 351. Reference to the "historical use" of a type of property is but a euphemism for the type of determination courts always make when they evaluate the purposes of a particular piece of property. For example, a court considering the intended use of a sidewalk will look at the sidewalk itself, but the sidewalk itself will in most cases tell the court nothing if the court does not assume or otherwise determine sidewalks' customary purpose.

The question for us is whether the supreme court intended to abandon this rule in Sisk. As we say above, in Sisk, the supreme court considered whether a motorist examining his damaged car

-16-

was an intended user of a country road. The decision in <u>Sisk</u> began by reciting the rule that pedestrians are not intended users of streets, and based on that rule, it rejected the plaintiff's argument that an exception should be drawn for country roads. <u>Sisk</u>, 167 Ill. 2d at 347-48. The supreme court then refuted two lines of reasoning contained in the underlying appellate court decision, among them the idea that the use must have been intended because country roads are commonly used by pedestrians. <u>Sisk</u>, 167 Ill. 2d at 349. The supreme court countered the appellate court's reasoning by noting that "Illinois courts have concluded that although pedestrians may be permitted users, they are not intended users of streets outside of marked crosswalks or other areas designated and intended for the protection of pedestrians." <u>Sisk</u>, 167 Ill. 2d at 349. Although it did not explicitly so state, the court in <u>Sisk</u> seemed to reject the idea of historical pedestrian use of roads not because "historical use" itself was an improper consideration, but rather because courts had long held that streets generally are not intended for pedestrian use. That conclusion stands to reason, because, as the quoted passage from <u>Sisk</u> implies, the customary placement of crosswalks or other designated pedestrian areas (along with the obvious safety hazards of encouraging unfettered pedestrian travel on streets) evinces an intent that pedestrians confine themselves to those areas. See <u>Wojdyla</u>, 148 Ill. 2d at 426 ("Pedestrian walkways are designated by painted crosswalks by design, and by intersections by custom. These are the indications of intended use"). Thus, in <u>Sisk</u>, if the supreme court had allowed historical pedestrian use of roads to suffice as evidence of the county's intent, it would indeed have elevated that permitted use to an intended use, in spite of what had long been recognized as controlling indicators of governmental entities' intent to confine pedestrian use of roads.

For the above reasons, we find harmony between <u>Marshall</u> and <u>Sisk</u>. The supreme court's decision in <u>Boub</u>, however, brings us more difficulty. There, the supreme court rejected an argument

that bicyclists' historical use of county roads indicated that they were intended users, but it did so only after upholding Marshall because it "simply referred to historical practice in attempting to ascertain the intended use, if any, of parkways" "[r]ather than establish historical practice as the touchstone by which intended use must be measured." Boub, 183 Ill. 2d at 532. If the supreme court in Boub meant that it read Marshall's citation to "historical use" as only a "simpl[e] refer[ence]" and not as a precedential part of the case, then Boub essentially cast aside "historical use" as a consideration for determining intent under section 3--102(a) of the Act. (The fact that Boub involved review of a motion for summary judgment, and the supreme court did not consider the historical use at least to create a question of fact, further indicates that the supreme court may have meant to discard "historical use" as a legally significant term in this context.) However, if the supreme court meant to contrast using historical practice "as the touchstone" for determining intended use versus using historical practice as a reference point to ascertain the intended use, then Boub stands for the proposition that historical use may yet be considered as a factor, even if minor, in a court's analysis of a governmental entity's intent under section 3--102(a).

We need not resolve here which reading of Boub is correct, because, even if "historical use" as a consideration for determining intent survives Boub, it survives under the narrow conception we describe above. Under that conception, the "historical use" consideration does not avail plaintiff in this case. Plaintiff argues that "the historical use of the gravel lot at issue here," as demonstrated by "significant evidence presented that patrons regularly parked in the lot," indicates that defendant intended that the lot be used for parking. Plaintiff's argument takes "historical use" far beyond the narrow concepts we outline above. In the context of determining whether a particular use of a particular property was "intended" under section 3--102(a) of the Act, the importance, if any, of

"historical use" is limited to its connection to how it must have informed the governmental entity's intent for a certain property. If the entity knew, based on historical use, that a type of property would most likely be used in a certain way yet did nothing to prevent that use on a particular piece of property, then the historical use may become evidence of the entity's intent for the piece of property. Instead of confining himself to this conception of "historical use," plaintiff would have the term refer to all uses of a property, even those coming after the governmental entity formed and manifested its intent for the property. Plaintiff would also have the term refer to the use made of a particular piece of property, instead of uses generally associated with the type of property. If we were to follow plaintiff's approach and expand "historical use" in these ways, we would erase the statutory distinction between permitted and intended uses: under plaintiff's theory, once a use is permitted on a particular property, it would become the historical use of the property and thus would become intended. Even if the idea of "historical use" is still relevant, it does not reach as far as plaintiff argues; we cannot under any reading of Marshall, Sisk, and Boub consider the actual uses of the particular gravel lot at issue in order to determine defendant's intent for the lot.

Aside from his citation to habitual use of this particular gravel lot for parking, plaintiff offers no indication, either from the record or in his arguments, that, in general, gravel lots of the type at issue here were or are customarily or historically used for parking, as would be required to establish a historical use that might indicate that plaintiff was an intended user of the gravel lot. Accordingly, we reject plaintiff's argument that historical use of the gravel lot indicates that it was intended to be used for parking.

Because the nature of the gravel lot and surrounding area unequivocally indicates that the gravel lot was not intended to be used as a parking lot, and because plaintiff has demonstrated no

historical use to indicate that the gravel lot was intended to be used as a parking lot, we agree with the trial court that defendant could not be held liable under section 3--102(a) of the Act.

For the foregoing reasons, we affirm the decision of the trial court.

Affirmed.

BURKE and HUDSON, JJ., concur.