2025 IL App (1st) 242022-U

FIFTH DIVISION
July 18, 2025

No. 1-24-2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| RAJAB AYYAD, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 L 011998 |
| | ) | |
| SAADAH DIAB and SUNDUS DIAB, | ) | Honorable |
| | ) | Daniel J. Kubasiak, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's grant of summary judgment in favor of defendants is affirmed where plaintiff released his ownership interest in property before the alleged fraud facilitating the sale of that building occurred.

¶ 2    On April 13, 2023, defendant Saadah Diab sold a building located at 5850 West Addison Street (the building) in Chicago that had been jointly owned by him and plaintiff Rajab Ayyad and used as the location of their once jointly owned auto-repair business. On November 29, 2023, Mr. Ayyad filed a two-count complaint against Mr. Diab and his daughter, Sundus Diab, for fraud and

breach of fiduciary duty.

¶ 3    In that lawsuit, Mr. Ayyad alleged that he had been promised an equal share of the profits from a contemplated sale of the building and, further, that Mr. Diab had used an allegedly fraudulently notarized quitclaim deed to surreptitiously transfer Mr. Ayyad's interest in the building to Ms. Diab, so that it could then be sold to a third party, all without his knowledge. The Diabs sought summary judgment on the basis that Mr. Ayyad had waived or was estopped from bringing those claims because he had released his interest in the building to them as part of an agreement reached in September 2012. This agreement was reflected in a handwritten receipt of partial payment signed by Mr. Ayyad in which he agreed to "release the building and the business."

¶ 4    The circuit court granted summary judgment in favor of the Diabs on both counts, reasoning that the September agreement was an unambiguous writing reflecting a "waiver" of any right that Mr. Ayyad had to profits from a future sale of the building. For the reasons that follow, we agree that the agreement Mr. Ayyad signed in September 2012 operated as a release of Mr. Ayyad's interest in the building and bars his claims. Accordingly, we affirm the circuit court's order granting summary judgment to the Diabs.

¶ 5                                    I. BACKGROUND

¶ 6    The following facts, taken from the pleadings and attachments to the parties' summary judgment briefing, provided the basis upon which the circuit court granted summary judgment.

¶ 7    In 1996, Mr. Ayyad hired Mr. Diab to work at his auto-repair business, Discount Auto Service, Inc. (the business). Within approximately one year, Mr. Ayyad and Mr. Diab agreed to become co-owners and partners in the business. In 2007, they acquired joint title to the building through a warranty deed and moved the business to that location.

¶ 8    In September 2012, Mr. Ayyad was in the Middle East and Mr. Diab was in the United

States. Mr. Diab and Mr. Ayyad discussed, long distance and by telephone, a potential buyout by Mr. Diab of Mr. Ayyad's ownership of the business. The details of those negotiations and the exact terms reached by the parties are disputed.

¶ 9 The parties do agree that Mr. Diab asked the owner of a travel agency in the West Bank to help facilitate his dealings with Mr. Ayyad. On September 26, 2012, the travel agency owner presented and Mr. Ayyad signed a document, handwritten in Arabic by the travel agency owner (the September agreement), confirming receipt of an $8,000 payment. The September agreement is titled "An Affidavit of Receiving the Amount of Money Mentioned Underneath." A certified translation of this document reads, "The mentioned amount [is] considered to be as a part of the agreed amount between both of us in return to release the building and the business upon the receipt of the whole agreed amount." The September agreement does not contain an integration clause and is signed by a witness and by Mr. Ayyad but not by Mr. Diab. Mr. Diab proceeded to make additional payments to Mr. Ayyad throughout the year, which brought the total amount paid to $35,000.

¶ 10 After the $35,000 in payments were completed, Mr. Diab took total responsibility for expenses associated with both the business and the building, including removing Mr. Ayyad from and refinancing the mortgage and taking out an additional loan to pay overdue taxes on the building.

¶ 11 Mr. Ayyad acknowledges that, at about the same time he signed the September agreement, he also signed a quitclaim deed for the building. Mr. Ayyad contends that the deed was not notarized and he signed this with the understanding that Mr. Diab would use it in the future if he found a buyer for the building in which case he would divide the profits from the sale with Mr. Ayyad. It is also undisputed that the recorded quitclaim deed that Mr. Ayyad signed contains the

3

signature of a notary certifying that the document was signed before her in-person in Illinois on September 12 and 14, 2012, which was when Mr. Ayyad was in the Middle East.

¶ 12    In April 2018, Mr. Diab traveled to the Middle East and presented Mr. Ayyad with a warranty deed that would transfer his interest in the building to Mr. Diab, which Mr. Ayyad refused to sign. On February 13, 2019, Mr. Diab recorded the quitclaim deed that Mr. Ayyad had signed in 2012 and had allegedly been fraudulently notarized, transferring Mr. Ayyad's interest in the building to his daughter, Ms. Diab. On April 13, 2023, the Diabs, using this quitclaim deed, sold the building to a third party and retained all proceeds from the sale.

¶ 13    On November 29, 2023, Mr. Ayyad filed the two-count complaint for fraud and breach of fiduciary duty against the Diabs. Mr. Ayyad alleged in that complaint that he had signed a blank, unnotarized quitclaim deed in case Mr. Diab needed to sell the building in the future, with the understanding that he would still receive an equal share of the profits from any sale. He alleged that the quitclaim deed was then fraudulently notarized and used to sell the building without his knowledge, thus "depriv[ing him] of the benefits of his ownership of the Property and the proceeds of the sale of the Property." Mr. Ayyad attached as exhibits to his complaint the original deed to the building as well as the allegedly fraudulently notarized quitclaim deed and the 2023 deed conveying the building to a third party.

¶ 14    The Diabs filed their answer and affirmative defenses on January 30, 2024. They argued that estoppel, waiver, and adverse possession prevented Mr. Ayyad from bringing his claims. They also presented an alternative version of events. According to the Diabs, the business was struggling in the period leading up to the signing of the September agreement and Mr. Ayyad and Mr. Diab were behind in their mortgage and tax payments. In August 2012, Mr. Ayyad told Mr. Diab in a face-to-face meeting that he was returning to the Middle East permanently and that Mr. Diab

should close the business and "let the bank take the building" because it was "worth nothing."

¶ 15    One month later, Mr. Diab called Mr. Ayyad in the Middle East and Mr. Ayyad agreed to sell both the business and the building to Mr. Diab for $35,000. When payment was completed, the Diabs refinanced the building and released Mr. Ayyad from any personal liability. The Diabs submitted as exhibits a June 2011 loan payment notice showing a mortgage with a balance of $440,519.05 that was in arrears in the amount of $14,304 and accruing late fees, a June 2011 bank notice showing delinquent property taxes in the amount of $10,302.11, an October 2011 appraisal of the building showing a market value of $175,000, a September 2012 appraisal showing a market value of $245,000, a copy of the September agreement, receipts showing payments made to Mr. Ayyad totaling $35,000, documents from the mortgage refinancing, and documents showing an additional loan taken out and later fully repaid by Mr. Diab to cover back taxes owed on the building.

¶ 16    On May 2, 2024, the Diabs filed a motion for summary judgment based on their affirmative defenses of waiver and estoppel. They argued that Mr. Ayyad's claims centered on the interpretation of the September agreement—a question of law—and whether that agreement was for the sale of both the business and the building. According to the Diabs, the phrase "to release the building and the business" in the September agreement could only mean that Mr. Ayyad intended to sell his interest in the building as part of their deal. They also argued that the parties' conduct after their execution of the September agreement evidenced an understanding that the building was meant to be sold. For example, Mr. Ayyad was released from personal liability on the mortgage, and Mr. Diab proceeded to make payments himself after the September agreement was signed. The Diabs argued that Mr. Ayyad's release of the building barred his claims that they had engaged in fraud or breached Mr. Daib's fiduciary duty in utilizing the quitclaim deed to sell

the building without his knowledge.

¶ 17    In response, Mr. Ayyad argued that the Diabs' reliance on the September agreement ignored "contemporaneous representations and agreements." He maintained that the September agreement could not convey an interest in real property because the statue of frauds required that the property be identified by address and there was no address on the agreement. He argued that summary judgment was inappropriate because several material terms were missing from the September agreement and, as a result, the Diabs had to rely on the parties' conduct to support their interpretation of the document. That same conduct, he argued, could also support his interpretation of the agreement—that he would have no interest in the business but would still be entitled to his share of profits from a future sale of the building. According to Mr. Ayyad, his longstanding relationship with and trust in Mr. Diab made it reasonable for him to rely on Mr. Diab's verbal assurances that his interest in the building would be protected.

¶ 18    Mr. Ayyad argued in the alternative that if the September 26, 2012, agreement did include the sale of the building (which he denied), there was a genuine issue of material fact as to whether Mr. Ayyad was fraudulently induced into signing the September agreement and whether pressuring him to do so had been a breach of fiduciary duty.

¶ 19    Mr. Ayyad attached to his brief opposing the motion for summary judgment his own affidavit and documents that he alleged were prepared as part of his negotiations with Mr. Diab and showed that the building was not meant to be included as part of the final agreement. These included a contract for the sale of just the business for a price of $35,000, a commercial lease agreement for the building, and a statutory power of attorney form authorizing Mr. Diab to sell the building between October 15, 2012, and April 15, 2013. Mr. Ayyad's signature was on all three documents, while Mr. Diab's signature appeared only on the power of attorney form.

¶ 20    On September 13, 2024, the circuit court granted the Diabs' motion for summary judgment, finding that Mr. Ayyad had "waived and/or [wa]s estopped from pursuing his claims." The court reasoned that the language of the September agreement was clear and indicated that both the building and the business were meant to be sold. According to the court, the record contained evidence that "the building" mentioned in the September agreement referred to the building, a fact which it noted was "corroborated through the appraisal and subsequent documents executed by [Mr. Diab] after the release was signed by [Mr. Ayyad]." The circuit court also *sua sponte* concluded that Mr. Ayyad's claims were time-barred.

¶ 21    This appeal followed.

¶ 22                                    II. JURISDICTION

¶ 23    The circuit court granted summary judgment in favor of the Diabs on all of Mr. Ayyad's claims on September 13, 2024. Mr. Ayyad timely filed a notice of appeal on October 10, 2024. This court has jurisdiction over the appeal pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 24                                    III. ANALYSIS

¶ 25    On appeal, Mr. Ayyad argues that the circuit court improperly concluded that there were no questions of material fact because the court's erroneous understanding was that the September agreement represented the parties' full agreement. Mr. Ayyad also argues that the court erred in relying on waiver and estoppel because those are contract defenses and he was asserting tort claims. The Diabs counter by arguing that the circuit court correctly found that waiver or estoppel barred Mr. Ayyad's claims because the September agreement was an unambiguous promise to sell Mr. Ayyad's interest in both the building and the business to Mr. Diab. We agree that the circuit

7

court's grant of summary judgment was proper here.

¶ 26     Summary judgment is appropriate where, construed liberally and in favor of the non-moving party, "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). Summary judgment should be denied and the issue referred to the trier of fact when reasonable individuals could draw different inferences from the undisputed material facts, or when there is a genuine dispute over a material fact. *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 424 (1998). Our review of a circuit court's grant or denial of summary judgment is *de novo*. *Doria v. Village of Downers Grove*, 397 Ill. App. 3d 752, 756 (2009).

¶ 27     The circuit court held that Mr. Ayyad had "waived and/or [was] estopped from pursuing his claims" because, according to the September agreement, he had sold his interest in the building. By signing the September agreement, Mr. Ayyad acknowledged receipt of partial payment and confirmed that upon receipt of "the whole agreed upon amount," he would "release the building and the business." The circuit court reasoned that this constituted an unambiguous release of both the business and the building.

¶ 28     Although Mr. Ayyad has framed his claims as ones for fraud and breach of fiduciary duty, underlying those claims is his contention that Mr. Diab breached an explicit promise "that the Property will remain for the both of us." Mr. Ayyad insists that he did not intend to relinquish his rights to the building or think that signing the September agreement was contrary to his understanding with Mr. Diab that the two would split the profits from any sale to a third party. The gist of his complaint is that the allegedly fraudulent deed allowed the Diabs to sell the building without his knowledge, thus facilitating their breach of an oral agreement to share the profits from

the sale of the building with him. The question of whether the Diabs defrauded Mr. Ayyad and perhaps breached a fiduciary duty to him, by fraudulently notarizing his signature on the quitclaim deed, therefore, hinges on this promise to share the profits of a sale. Mr. Ayyad's claim is that while this promise to share profits is not set out in the September agreement, it was the parties' understanding that this would occur at the time he signed that written agreement.

¶ 29    In Illinois, however, a written agreement is presumed to include all material terms agreed upon by the parties. *K's Merchandise Mart, Inc. v. Northgate Ltd. Partnership*, 359 Ill. App. 3d 1137, 1143 (2005). There are three ways that evidence of what Mr. Ayyad claims was a separate oral promise to share profits would not be barred by the September agreement: (1) as proof of an agreement that was separate and distinct from the September agreement (*Hartbarger v. SCA Services, Inc.*, 200 Ill. App. 3d 1000, 1009 (1990)), (2) as proof of terms allegedly agreed to that were consistent with and did not contradict or vary the September agreement and that agreement was not the fully integrated final and complete agreement of the parties (*J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 162 Ill. 2d 265, 275 (1994)), or (3) as evidence of the September agreement's proper interpretation, if the terms of that agreement were facially ambiguous (*Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 463-65 (1999)). Although Mr. Ayyad does not separate his arguments out into these three avenues, we have examined each and it is clear that none of these circumstances are present here.

¶ 30    We first consider the question of whether the oral promise to share profits from a sale, as alleged by Mr. Ayyad, is sufficiently separate and distinct from the September agreement that it could be enforceable notwithstanding that written agreement. Evidence of an extrinsic agreement may be admissible if it is "so far a separate and distinct matter as to be capable of existence as an independent legal act." *Midwest Builder Distributing, Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d

645, 662 (2007). No such separate and distinct agreement exists here because both the September agreement and the alleged oral agreement directly concern the same subject matter—the building. Thus, this alleged oral promise cannot be considered as independent of the written September agreement.

¶ 31    The next way that evidence of the alleged oral promise to share profits could be considered—as a supplemental term—depends on whether the September agreement is an integration. Ordinarily, when parties reduce their agreement to a writing that is complete, final, and unambiguous, all prior negotiations leading to the execution of the contract are merged into the writing (*Harris Trust & Savings Bank v. Chicago Title & Trust Co.*, 84 Ill. App. 3d 280, 283 (1980)) and parol evidence of a prior or contemporaneous agreement is inadmissible (*Hartbarger*, 200 Ill. App. 3d at 1009). That is not the case, however, when a writing is only a partial integration—a final but not complete expression; in such cases, additional terms may be introduced to supplement the document as long as they are consistent with but do not vary or contradict the terms in the writing. *J & B Steel Contractors, Inc.*, 162 Ill. 2d at 275.

¶ 32    According to our supreme court in *J & B Steel Contractors*, 162 Ill. 2d at 272, the first question in determining whether, and to what degree, a contract is an integration, is whether it is a final expression of the agreement between the parties. The court found the purchase order at issue in that case was a final expression of the parties' agreement because the plaintiff began performance without responding, a circumstance the court concluded was "sufficient as to the question of finality." *Id.* at 272-73. Similarly here, it is undisputed that Mr. Diab began making payments to Mr. Ayyad immediately after Mr. Ayyad signed the September agreement. Thus, that written agreement was final.

¶ 33    The second question we ask when considering whether a contract is an integration is

whether the expression is complete. *Id*. at 272. It is clear, on its face, that the September agreement is not a complete expression of the parties' agreement, first, because it contains no integration clause. More importantly, the only figure listed is "$8,000" as payment of "part of the agreed amount," so the written agreement does not include the full amount of money to be paid. Moreover, there is no description of the manner of or timeframe for future payments, and no description or address of the "building" or of the "business." The agreement does make clear, however, that some amount of money will be paid, in some fashion, as consideration for Mr. Ayyad's promise to "release the building and the business."

¶ 34    Since the September agreement is only a partial integration, parol or extrinsic evidence may be introduced to show additional consistent terms, but only if they do not vary or contradict it. *Id*. at 275. Such additional consistent terms would include, for example, the final price of $35,000 and descriptions of the business and building.

¶ 35    The problem for Mr. Ayyad in this case is that by arguing that one of those additional terms was an agreement to share profits from a future sale of the building, he seeks to introduce terms that would vary the plain meaning of the terms used in the September agreement because the language of that agreement reflects Mr. Ayyad's intent to sell to Mr. Diab his entire interest in the building they had bought together.

¶ 36    In the September agreement, Mr. Ayyad agreed to "release the building and the business." Black's Law Dictionary defines "release" as the "the act of giving up a right or claim to the person against whom it could have been enforced" or "the relinquishment or concession of a right, title, or claim." Black's Law Dictionary (12th ed. 2024). In keeping with the generally understood meaning of the word "release," Mr. Ayyad does not dispute that the September agreement reflects an intention to relinquish his interest in the *business* to Mr. Diab. To find that "release" referred to

the complete sale of the business but not also of the building, however, would give the term two different meanings within the same sentence. Moreover, it would require us to define "release" as something that allowed Mr. Ayyad to have a continuing right to the profits of the sale—which is contrary to the plain meaning of the word. We simply cannot read the September agreement in a way that would be consistent with a separate agreement whereby Mr. Ayyad retained his right to share in the profits from some later sale of the building.

¶ 37    For similar reasons, we cannot find that there is any ambiguity in the September agreement such that it could be read in the manner Mr. Ayyad suggests. According to Mr. Ayyad, "release of the 'building' meant only that he was formally releasing the Business from paying rent to him as the continued co-owner of the Property." In making this argument, Mr. Ayyad is contending that "release" is ambiguous and thus could be construed in the manner he suggests. In support of his understanding of the term, Mr. Ayyad points to several documents which, he says, "are inconsistent with any understating [*sic*] or intent to convey the Property to the [Diabs]." Mr. Ayyad specifically references a contract that was for the sale of only the business and lease of the building to the business, neither of which were signed by Mr. Diab, as well as the power of attorney document authorizing Mr. Diab to sell the building for a limited period of time.

¶ 38    The first problem with this argument is that, in determining whether the September agreement is ambiguous, we are limited to the four corners of that agreement. *Air Safety*, 185 Ill. 2d at 463-65. Looking strictly to the language of the September agreement, the phrase "release the building and business" is not facially ambiguous and we find no support for Mr. Ayyad's interpretation in the language of the document itself.

¶ 39    Second, even if we were to look beyond the four corners of the agreement, the evidence Mr. Ayyad cites, such as a draft contract for the sale of only the business signed by himself but not

Mr. Diab shows, at most, that Mr. Ayyad may have wanted to work out a deal with Mr. Diab where he sold him only the business. As this court has explained, "[a]ny particular interpretation that only the plaintiff may have envisioned at the time a contract is executed is immaterial." *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 524 (2001). The parties may have discussed a different deal, but Mr. Ayyad can point to nothing within or outside the September agreement that supports his claim that the agreement he signed did not reflect a sale by him to Mr. Diab of both the building and the business.

¶ 40 Under any of the three avenues discussed above, Mr. Ayyad is precluded from offering the evidence that he would need to create a question of fact. The evidence he offers would not reflect an agreement on a separate and distinct matter, such evidence cannot vary or contradict the terms of the September agreement, and he has not shown the existence of an ambiguity that would allow the admission of extrinsic evidence of this alleged oral agreement. Thus, this September agreement precludes the claim that the Diabs acted fraudulently or that Mr. Diab breached his fiduciary duty to him by utilizing a fraudulently notarized quitclaim deed to sell the building.

¶ 41 Mr. Ayyad tries to get around the September agreement and these contract principles by quoting *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill. App.3d 37, 52 (1979) for the proposition that "the terms of any written contract executed in conjunction with fraud are irrelevant to a cause of action grounded not in contract but in tort." Mr. Ayyad's reliance on *Mother Earth*, however, is misplaced. In that case, the plaintiff, who was the purchaser of a nightclub, signed a contract that expressly disclaimed any additional warranties outside of the contract. *Id.* at 42. The court determined that this disclaimer could not be used as a defense against the plaintiff's fraud action, which was based on additional false representations made about the business. *Id.* at 52.

¶ 42 Unlike in *Mother Earth*, in this case the alleged fraud took place after Mr. Ayyad signed

the contract that released any interest in the building. That contract, and the limitations on a court's consideration of any inconsistent contract terms outlined above, control here. Because Mr. Ayyad had signed a written agreement giving up any interest in the building, the Diabs' alleged use of a fraudulent notarization of his signature to sell the building simply caused him no injury and cannot be the basis for a fraud claim. See, *e.g.*, *City of Chicago v. Michigan Beach Housing Co-op.*, 297 Ill. App. 3d 317, 323 (1998) ("Damage is an essential element of fraud.").

¶ 43    As noted in the factual background, Mr. Ayyad made an alternative argument in the circuit court that summary judgment was improper because of his claim that he had been fraudulently induced to sign the September agreement. Mr. Ayyad has not pursued that alternative theory on appeal. In addition, as the Diabs pointed out to the circuit court, the Diabs were not even in the vicinity when Mr. Ayyad signed the September agreement and there is no evidence that they dictated its terms or drafted it or that Mr. Ayyad could not have put in protective language if he thought that it did not accurately reflect the parties' agreement.

¶ 44    Truly, the most that can be said is that Mr. Ayyad signed an unambiguous release of his entire interest in the building with the hope—or perhaps even the understanding—that his old friend and business partner would still give him half the profits when and if he sold the building that they had owned together. Unfortunately for Mr. Ayyad, that claim is barred by his signing a written agreement to the contrary.

¶ 45    We note that while neither party raised an affirmative defense based on the statute of limitations, the circuit court also granted summary judgment on the basis that these claims were time-barred. The court did not provide an explanation for this determination. The parties agree that there was no issue of untimeliness. We have no need to address this issue.

¶ 46                              IV. CONCLUSION

¶ 47    The circuit court did not err in granting summary judgment in favor of the Diabs where no genuine issues of material fact exist. We affirm the circuit court's grant of summary judgment.

¶ 48    Affirmed.