2022 IL App (1st) 200895

FIRST DISTRICT
FIRST DIVISION
January 31, 2022

No. 1-20-0895

| | | |
|---|---|---|
| SHIRLEY PRYOR, Individually and as Independent | ) | Appeal from the |
| Administrator of the Estate of Clark Pryor, and KANELLE | ) | Circuit Court of |
| PRYOR, | ) | Cook County |
| | ) | |
| Plaintiffs-Appellants, | ) | No. 17 L 011593 |
| | ) | |
| v. | ) | Honorable |
| | ) | Christopher E. Lawler, |
| THE CHICAGO TRANSIT AUTHORITY, | ) | Judge Presiding. |
| | ) | |
| Defendant-Appellee. | ) | |

JUSTICE COGHLAN delivered the judgment of the court, with opinion.
Presiding Justice Hyman and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    In this wrongful death and survival action against defendant the Chicago Transit Authority (CTA), plaintiff Shirley Pryor, as independent administrator of the Estate of Clark Pryor (Clark) (her son), and Kanelle Pryor (Clark's son) appeal the section 2-619 dismissal of the second amended complaint with prejudice (735 ILCS 5/2-619 (West 2018)). The Pryors argue that the rail operator negligently and willfully and wantonly operated the train that fatally hit Clark by failing to reduce the train's speed as it entered the elevated platform, based on the foggy conditions and Clark's proximity to the platform's edge. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On May 1, 2017, at about 11:39 p.m. (46 minutes before the incident), Clark entered the Roosevelt Orange line CTA station, purchased a train ticket, and eventually stood on the outdoor elevated platform. It was foggy outside and the ground was wet from prior precipitation. At this elevated train station, there are two tracks that run parallel, northbound and southbound, with a

platform separating the two tracks.

¶ 4       Shortly after midnight on May 2, 2017, at about 12:25 a.m., a train traveling southbound from the Loop and heading towards Midway approached the Roosevelt train station. As the rail operator pulled into the station, Clark walked off the platform and fell onto the train tracks. The train hit Clark, and he died from his injuries.

¶ 5       CTA surveillance video at the Roosevelt Orange line station recorded the activity relating to the incident. For approximately 5 minutes and 22 seconds before the incident, Clark appears in the video and can be seen roaming around the platform; his stance and walk unsteady, and at times rocking back and forth. At one point, Clark appears to have urinated on the platform. At 12:25:54 a.m., the approaching southbound train's headlights became visible, and Clark walked towards the southbound train tracks from the center of the platform and in front of the elevator bank that appears to block the oncoming train's view of the platform. At 12:25:55 a.m., Clark stepped on the blue tactile edge and continued walking towards the train tracks. At 12:25:56 a.m., Clark, while looking down, walked off the platform, fell onto the train track, and was hit by the oncoming train.

¶ 6       On November 14, 2017, the Pryors filed a wrongful death and survival action based on negligence and willful and wanton conduct against the CTA. The complaint alleged that Clark "was an impaired rider" and he "stumbled repeatedly while waiting to board an Orange Line 'L' train." The complaint asserted that the CTA "knew or should have known that [Clark] was at a heightened risk of sustaining serious injury and/or death while waiting to board an Orange Line 'L' train" but failed "to take any action to assist [Clark] prior to his death." During the course of litigation, investigations into the incident were conducted, and more than 23 individuals were deposed. Relevant discovery is summarized below.

¶ 7       Maria Lagunas was the rail operator of the train that fatally hit Clark. At her deposition,

Lagunas stated that the allowable speed to enter a platform is 35 miles per hour, but a rail operator should "start lowering the speed" sooner when a platform is harder to see. When approaching a train station, Lagunas looks for people "[n]ot getting too close to the blue stripe *** on the platforms" because they are at risk of falling onto the tracks. As part of her training, she was instructed to look for people who are unstable or intoxicated when the "train is properly berthed on the platform" but not before. When she enters a train station, Lagunas was trained under the CTA's internal standard operating procedures "to look, observe, then look straight, berth the train, again look, properly brake, *** look outside and then you see the people."

¶ 8        Regarding the Roosevelt platform, Lagunas stated that the platform is on the rail operator's left side going towards Midway, making it "harder to see," and it is more difficult to see when it is foggy and nighttime. If it is foggy outside but the control center did not instruct her to reduce her speed to 6 miles per hour to enter the station, she would "go actually like 15 and then slow it down to properly berth the train into [the] station." If she saw an individual standing too close to the blue tactile line, she would use her emergency brake and sound the horn to "alert them that the train is coming." If the train is moving at 6 miles per hour and the emergency brake is pulled, the train can be stopped almost instantaneously. Applying the emergency brake to a train traveling at 15 miles per hour would stop the train within a second or two.

¶ 9        On the day of the incident, when the "nose" of her train reached the beginning of the platform, Lagunas was going less than 35 miles per hour. She had started braking but could not recall how fast the train was moving. She did not sound the horn as she entered the station. Lagunas had less visibility of the platform because it was nighttime, but the lighting "was normal."

¶ 10        While the train was still entering the station, somebody stepped off the platform—"it happened so fast," and she "did not see him at all." Lagunas first saw him "as soon as that person

jumped" directly in front of her train because "it was like that [ ] instantly." "When he jumped [she] stopped the train right away." Lagunas "couldn't stop sooner because it happened so fast." She did not see Clark "because he was behind the elevator" but "saw other people up ahead." Lagunas applied the emergency brake when she "noticed he was underneath."

¶ 11    Other rail operators were also deposed and explained the standard operating procedures implemented by the CTA. Rail operators enter a platform at 35 miles per hour "and then as you get closer to your mark, we're down to about 5, 10." Generally, arriving at the station and boarding passengers is "really a quick process" Rail operators are not required to automatically reduce the train's speed to between 6 and 15 miles per hour at night or bad weather. Rather, rail operators use "operational sight" as a guide to determine the train's speed, meaning they should "operate [at] half the range of vision." For example, if a rail operator can see 500 feet ahead, he should be able to stop the train within half that—about 250 feet. A rail operator does not slow down a train every time an individual is on the blue tactile edge because "operating time would be a mess, we would be behind schedule."

¶ 12    Rovaughan Graham has been the general manager of Transit Safety at the CTA since 2016. At his deposition, he stated that rail operators are required to follow the CTA standard operating procedures. He explained that if rail operators see someone too close to the edge of a platform, "they would give short bursts of the horn." In emergency situations, rail operators have the opportunity "to slam on the brakes" or reduce speed. Weather conditions, such as fog or rain, could affect the rail operator's visibility, and the train should be stopped if "visibility is impaired." Rail operators should also keep a proper lookout while operating the train and doing so does not impose an additional burden.

¶ 13    Regarding the surveillance video of this incident, Graham "would say [Clark] looks

unstable on the platform" and was not on the platform's blue tactile edge. Graham explained that "the challenge for the operator would be they're moving into the station, so they're just seeing him on the platform at this point." Graham stated that the transit safety department did not identify anything that the operator could have done to prevent the incident.

¶ 14    The Safety, Compliance and Risk Management department of the CTA prepared a final incident report, which was submitted to the Illinois Department of Transportation. The incident narrative stated the following:

> "Transit Safety conducted a fact finding interview with Operator of run #726, Maria Lagunas. Lagunas stated in substance but not verbatim, while entering Roosevelt Station southbound, she observed a male on the tactile edge of the platform who appeared to lose his balance and fall to track level. Lagunas stated she put her train in emergency braking and attempted to stop her train but was unable to stop before making contact with the male. Lagunas next notified the Control Center of the incident. Lagunas stated she was shaken up as a result of the incident and requested medical assistance.
>
> ***
>
> Transit Safety reviewed the platform video from the Roosevelt Station. The video showed [Clark], walking across the platform from east to west. Next, [Clark] is observed stepping off the tactile edge of the southbound side of the platform and onto the right of way as run #726 entered the station."

"Transit Safety [did] not have any recommendations."[1] The report concluded that the probable cause of the incident was "imprudent customer actions." Clark "walked off of the platform and

---

[1]Ronnie Phipps, a safety officer for the CTA who investigated the incident and originated the report, explained that the purpose of this section was to determine whether there was anything that could have been done differently to prevent similar events from happening in the future.

trespassed onto the right of way and into the path of the oncoming train."

¶ 15    On July 10, 2019 (1½ years after commencing this action), the Pryors filed an amended complaint, asserting that "a common carrier owes its passengers the highest duty of care," which the CTA breached through its rail operator's negligent operation of the train and contrary to the CTA's training, rules, and procedures. The CTA filed a combined section 2-615 and 2-619 motion to dismiss (735 ILCS 5/2-615, 2-619 (West 2018)) and provided the video surveillance of the incident. The CTA argued that the Pryors failed "to identify any recognized legal duty which CTA owed the Decedent and/or breached." The CTA relied on this court's decision in *Anderson v. Chicago Transit Authority*, 2019 IL App (1st) 181564, ¶ 35, finding "that mere presence on a CTA platform *** without more, does not garner the injured person the status of a 'passenger' to whom the CTA owes the highest duty of care." In the alternative, the CTA argued that Clark "was a trespasser" and that the danger posed by the moving train was "open and obvious."

¶ 16    The Pryors incorporated in their response to the motion to dismiss a "Preliminary Safety Report," prepared by their engineering expert, Carl Berkowitz. In the section of the report labeled "B. Failures," Berkowitz stated the following:

"The key failure is the train operator not following the required safety procedures upon entering Roosevelt Station. Standard operating procedures and established standards of care required the train operator to:

- Slow the train down to 6 mph due to foggy conditions.

- Upon seeing [Clark] standing precariously at the edge of the platform (as indicated in the CTA incident report), to immediately stop the train and blast the horn.

- If the train operator did not see [Clark] (as stated in Ms. Lagunas' deposition in contradiction to the incident report), then perform a proper look out of the train platform

- 6 -

upon entering the station."

Berkowitz concluded that "[b]ased on the information presented in this Safety Report and with a reasonable degree of engineering certainty, it is my professional opinion that Chicago Transit Authority did not meet recognized national standards of care for the operation of a train and is thus responsible for this accident."

¶ 17 The trial court construed the CTA's "entire motion as a section 2-619 motion to dismiss" because the motion was not labeled separately and the "open and obvious" analysis "require[d] facts and materials appearing outside the complaint, and thus exceeds the scope of section 2-615." In dismissing the complaint, the trial court agreed with the CTA that *Anderson* was dispositive because "these facts do not establish that Decedent was a CTA passenger when he fell onto the tracks" to whom the CTA owed any "heightened duty of care." The trial court also held that the Pryors failed to allege "an ordinary duty owed" because they could not establish that the CTA knew Clark was "impaired." The trial court clarified its ruling, explaining that plaintiff "may replead the facts alleged in the first amended complaint in the second amended complaint, however the duty paragraphs should be amended to address ordinary care and willful and wanton, not the heightened duty."

¶ 18 The Pryors filed "a proposed amended complaint" at "the Court's request," alleging that the rail operator breached its duty to operate the train safely and, in violation of CTA internal rules and industry safety standards, by failing "(a) to reduce the speed of her train for weather and platform conditions and/or (b) to reduce the speed of the train once observing a person standing close to the edge of the platform." The complaint also alleged that the CTA acted willfully and wantonly by "failing to take any measure to stop, reduce speed, or blow the horn, despite having actual knowledge that the train was reasonably likely to come in contact with Clark." The trial

judge scheduled a case management conference "to discuss [plaintiff's] 2nd amended complaint (filed) prior to [defendant] filing a responsive pleading." On the same day as the scheduled conference, the trial court again dismissed the case, citing to *Anderson* and finding that "the facts here are insufficient to allege either heightened or ordinary duties of care."

¶ 19                                  II. ANALYSIS

¶ 20        The Pryors appeal the dismissal of the action under section 2-619. A section 2-619 motion to dismiss disposes of "issues of law and easily proved issues of fact at the outset of litigation." *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003). Under a section 2-619 motion to dismiss, a court " 'must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party.' " *Valerio v. Moore Landscapes, LLC*, 2021 IL 126139, ¶ 20 (quoting *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 189 (1997)). In doing so, "the court accepts as true all well-pleaded facts in the complaint and all inferences that may reasonably be drawn in plaintiffs' favor." *Id.* We review a dismissal under section 2-619 *de novo*. *Id.*

¶ 21        The Pryors argue that "*Anderson* does not compel dismissal of the *** action, as *Anderson* had nothing to do with rail operations or a rail operator's duty to drive safely," unlike their claims that were "based solely on the rail operator's negligent and/or willful and wanton operation of the train." The Pryors assert that this case is analogous to *Skelton v. Chicago Transit Authority*, 214 Ill. App. 3d 554 (1991), not *Anderson*.

¶ 22        Although the Pryors argue that *Anderson* is not dispositive because the second amended complaint (per the trial court's instruction) did not include allegations that Clark was a "passenger" to whom the highest duty of care was owed, the Pryors included that allegation in the first amended complaint and "intend to preserve said argument." Moreover, given the CTA's classification as a "common carrier," determining whether Clark was a "passenger" is a necessary component of a

negligence analysis.

¶ 23    In *Anderson*, the decedent paid his fare, entered the station's platform, and "stood there about 30 minutes with some 11 trains passing on both sides of the tracks." 2019 IL App (1st) 181564, ¶ 4. The "decedent never boarded any CTA train on the morning of his death but rather appeared to be a CTA customer who was weighing whether to enter a train." *Id.* ¶ 5. Within the last few minutes before the incident, the "decedent tripped or stepped on [a] bottle or can, knocking it into the trackbed before he toppled over the track and landed face down on the third rail, where he was electrocuted." *Id.* ¶ 7. "No train was approaching when he fell on the track." *Id.* The plaintiff filed wrongful death and common-carrier negligence claims against the CTA, alleging

> "that decedent was a CTA passenger to whom the CTA owed the 'highest duty of care' and that the CTA negligently failed to fulfill its duty insofar as the employees *** failed to approach decedent to assess his condition even though he was displaying 'clear signs and symptoms' of a 'medical emergency.' " *Id.* ¶ 9.

The plaintiff alleged that the decedent "was having a 'medical emergency' as a result of his diabetic condition," which caused his visible "unusual behavior" on the platform. *Id.* ¶ 8. The *Anderson* court agreed with the CTA, finding that the decedent was not a "passenger," entitled to a "heightened duty of care" owed by a common carrier, because the decedent was not "in the act of boarding" upon, or "in the act of alighting from the carrier's vehicle." *Id.* ¶ 27.

¶ 24    In reaching its decision, the *Anderson* court found *Skelton* "of questionable value." *Id.* ¶ 32. In *Skelton*, the plaintiff stood at the edge of the platform and "started waving to get the attention of the driver of the train to make sure the train would stop." *Skelton*, 214 Ill. App. 3d at 563. As the train approached the station, the plaintiff lost his balance, fell onto the track, and was struck by the oncoming train. *Id.* at 561, 563-64. The court found that there was "no dispute that plaintiff

was at the place provided by the CTA for waiting passengers and had placed himself under the care of the CTA" while he waited for the train. *Id.* at 573. The *Skelton* court held "that the evidence presented at trial established that plaintiff was a passenger" and the CTA "owed the plaintiff a duty of 'the highest degree of care.' " *Id.*

¶ 25　　　　*Anderson* found "*Skelton*'s holding—that the plaintiff's presence on the platform, together with intent to board, was enough to make him a passenger—misplaced." *Anderson*, 2019 IL App (1st) 181564, ¶ 32. *Anderson*, instead, held

> "that mere presence on a CTA platform, followed by an accidental death on the train tracks possibly from a medically-induced condition, without more, does not garner the injured person the status of a 'passenger' to whom the CTA owes the highest duty of care, notwithstanding that the injured person paid his fare and at one point had intentions of boarding a train." *Id.* ¶ 35.

¶ 26　　　　Here, we find *Anderson*, and not *Skelton*, dispositive. There is no dispute that Clark lingered on the platform for about 46 minutes without boarding any of the trains that entered and departed the station. Those facts are consistent with *Anderson*. Because Clark was not in the process of boarding a train, nor did his actions demonstrate any such intent, *Skelton* is distinguishable. We agree with *Anderson* that an individual must be "in the act of boarding, be upon, or be in the act of alighting from the carrier's vehicle" to be considered a "passenger" to whom the highest degree of care is owed. *Id.* ¶ 27. The facts, as alleged, do not demonstrate such actions. Therefore, under *Anderson*, we do not find that Clark was a passenger to whom the CTA owed the highest duty of care.

¶ 27　　　　We next consider whether the complaint sufficiently pled a cause of action for "ordinary negligence." The Pryors argue that the CTA had a duty "to use ordinary care for the safety of Clark"

and breached that duty because the train operator "chose to enter the station at the fastest rate of speed," despite the "poor conditions, with limited visibility" and "decided to not slow or stop her train, even after seeing Clark from a distance, close to the edge of the platform."

¶ 28    "It is well settled that every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act ***." *Widlowski v. Durkee Foods*, 138 Ill. 2d 369, 373 (1990). To state an action for negligence, the plaintiff must plead that the defendant owed the plaintiff a duty, the defendant breached that duty, and an injury was proximately caused by the breach. *Steed v. Rezin Orthopedics & Sports Medicine, S.C.*, 2021 IL 125150, ¶ 36. An analysis of the duty element involves consideration of the following four factors: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951, ¶ 22. "Whether a duty exists is a question of law for the court to decide." *Id.* ¶ 21. The elements of breach and proximate cause are factual matters for the jury to decide. *Flores v. Westmont Engineering Co.*, 2021 IL App (1st) 190379, ¶ 25. If the defendant owed no duty to the plaintiff, the plaintiff's claims fail as a matter of law. *Id.*

¶ 29    Turning to the first two factors of the duty analysis, we find that the reasonable foreseeability and likelihood of the injury in this case weigh in favor of the CTA. "When a condition is deemed open and obvious, the likelihood of injury is generally considered slight as it is assumed that people encountering potentially dangerous conditions that are open and obvious will appreciate and avoid the risks." *Park v. Northeast Illinois Regional Commuter R.R. Corp.*, 2011 IL App (1st) 101283, ¶ 12.

¶ 30    In *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶¶ 4, 8, the 12-year-old

plaintiff was seriously injured when he fell after attempting to jump onto a moving train. In his personal injury action, the plaintiff alleged, in part, that the defendants failed to "otherwise warn of the danger of trains." *Id.* ¶¶ 1, 15. Finding in favor of the defendants, our supreme court held that "we now explicitly recognize as a matter of law that a moving train is an obvious danger that any child allowed at large should realize the risk of coming within the area made dangerous by it." *Id.* ¶ 35. This court has similarly held that a moving train poses an "open and obvious" danger. See *Park*, 2011 IL App (1st) 101283, ¶ 18 (affirming the trial court's finding that "as a matter of law *** the train and the danger it presented were open and obvious"); *Zokhrabov v. Park*, 2011 IL App (1st) 102672, ¶ 4 (recognizing that this "court recently held that the personal danger posed by stepping in front of a moving train is an open and obvious danger").

¶ 31    Here, we find that the CTA train entering the Roosevelt station posed an "open and obvious" danger. A reasonable person in Clark's position "exercising ordinary perception, intelligence and judgment would recognize both the condition and the risk involved" in walking off the train platform into the path of an oncoming train. *Park*, 2011 IL App (1st) 101283, ¶ 14. Given the "open and obvious" danger posed by the moving train, Clark's actions in walking past the blue tactile edge off the platform directly onto the path of an almost simultaneously approaching train were not reasonably foreseeable to the CTA. See *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 448 (1996) ("The open and obvious nature of the condition itself gives caution and therefore the risk of harm is considered slight; people are expected to appreciate and avoid obvious risks."). And as the depositions established, a rail operator is not required to reduce a train's speed based on foggy weather conditions where, as here, the visibility of the platform was not reduced but "normal."

¶ 32    A duty of care may nonetheless be imposed under the "distraction exception" or the

"deliberate encounter exception" to the open and obvious rule. *Park*, 2011 IL App (1st) 101283, ¶ 22. The distraction exception applies "if there is a reason to expect that the plaintiff's attention might be distracted so that he would not discover the obvious condition." *Id.* ¶ 24. The "deliberate encounter exception" applies "when a defendant has reason to expect that a plaintiff will proceed to encounter the known or obvious condition, despite the danger, because to a reasonable person in his position the advantages of doing so would outweigh the apparent risk." *Id.* ¶ 26.

¶ 33        In this case, the pleadings and/or video surveillance do not support the application of either exception.

¶ 34        The Pryors, however, argue that the "open and obvious" doctrine is irrelevant because the "train did not cause Clark's death" and "[n]either did the tracks"; rather, he "died because [the rail operator] failed to take reasonable measures to prevent fatal contact with a person in known and appreciated peril." We consider this a distinction without a difference.

¶ 35        In *McDonald v. Northeast Illinois Regional Commuter R.R. Corp.*, 2013 IL App (1st) 102766-B, ¶ 3, the decedent was struck by an express train traveling through a station towards Chicago, as he crossed the train tracks at the pedestrian crosswalk. The pedestrian signals at the train station had not yet been activated. *Id.* The plaintiff alleged that the defendant breached the heightened duty of care owed by common carriers by operating "a train without keeping a sufficient lookout," "failing to adequately warn the decedent of the approach of the train," "operating its train at an excessive rate of speed given the fact that the pedestrian signals had not been activated," and "failing to adequately slow the train and avoid hitting the decedent." *Id.* ¶ 4. This court found no duty to warn because "the danger posed by the oncoming train in this case was open and obvious and that the decedent should have realized the risk of trying to hurry across the tracks before it arrived at the station." *Id.* ¶ 25.

¶ 36 Here, the Pryors, like the plaintiff in *McDonald*, alleged negligent conduct based, in part, on the "excessive" speed of the train and the rail operator's failure to "adequately slow the train." Even though the plaintiff in *McDonald* alleged a breach of a duty to warn and the Pryors alleged a breach of a duty of care, the same outcome is required regardless of the duty alleged based on the "open and obvious" danger posed by a moving train.

¶ 37 The Pryors also argue that we should look to *Skelton*, which rejected an application of the "open and obvious" danger rule where the plaintiff's theory of liability was not based on premises liability but "negligence in the operation of the train." *Skelton*, 214 Ill. App. 3d at 573. However, *Skelton* was decided before our supreme court in *Choate* expressly held that a moving train poses an "open and obvious" danger. Based on *Choate*, we find that the "open and obvious" danger posed by the moving train bars a finding of a duty as a matter of law. *Greenhill v. REIT Management & Research, LLC*, 2019 IL App (1st) 181164, ¶ 65. For this same reason, the CTA's internal rules addressing a rail operator's responsibilities cannot impose a legal duty given Clark's disregard for the "open and obvious" danger posed by the moving train.

¶ 38 The last two factors of the duty analysis—the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the CTA—also weigh in favor of the CTA. In weighing these factors, "[w]e may take judicial notice of the magnitude of the CTA's operations." *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 234 (2010). In its motion to dismiss, the CTA stated that in 2015, CTA trains ran on 224.1 miles of track, made about 2145 trips each day, serviced 145 stations, and had an annual ridership of 241.7 million. The Pryors argue that the CTA was required to "take some measures to not kill Clark," ignoring that Clark voluntarily elected to walk off the platform into the path of an oncoming train. The CTA operates a *rapid* transit and cannot be expected to guard against the sudden and unreasonable actions of

nonpassengers. See *id.* (a court may consider the whether the imposition of a duty would be "overwhelmingly detrimental to the efficient performance of the transit system" (internal quotation marks omitted)).

¶ 39    In sum, the Pryors failed to sufficiently plead that the CTA owed Clark a duty of care sufficient to withstand a motion to dismiss.[2] See *id.* at 233 ("[t]he burden to prove all the elements of a negligence claim remains on the plaintiff throughout the proceedings").

¶ 40    The Pryors also allege that the willful and wanton conduct counts survive dismissal because "there is ample evidence for a jury to find [the rail operator] acted with a willful and wanton disregard for Clark's safety in her operation of the train."

¶ 41    "There is no separate and independent tort of willful and wanton conduct"; rather, it "is regarded as an aggravated form of negligence." *Id.* at 235; see *Doe v. Coe*, 2019 IL 123521, ¶ 78 (duty, breach of the duty, and the breach being the proximate cause of the plaintiff's injury must be alleged and proved for a willful and wanton conduct cause of action). To state a cause of action for willful and wanton conduct, "a plaintiff must allege either a deliberate intention to harm or an utter indifference to or conscious disregard for the welfare of the plaintiff." *Adkins v. Sarah Bush Lincoln Health Center*, 129 Ill. 2d 497, 518 (1989). Although the issue of whether a defendant's actions amounted to willful and wanton conduct is generally a question of fact for the jury to decide, a court may properly decide the issue as a matter of law "where the record shows absolutely no evidence that the defendant displayed either an utter indifference to or a conscious disregard for the plaintiff's safety." *Mitchell v. Special Education Joint Agreement School District No. 208*, 386 Ill. App. 3d 106, 111 (2008).

---

[2]The CTA also argues that it owed no duty to Clark because he trespassed onto the train tracks. Because we find in favor of the CTA, we need not address this claim.

¶ 42    The Pryors' willful and wanton conduct claim rests on allegations that the rail operator "showed an utter indifference to and/or conscious disregard for Clark's safety" by, mainly, "failing to take measures to avoid colliding with Clark, including reducing speed, stopping and/or blowing the horn." Clark emerged from behind the elevator bank and in the "zone of danger" seconds before the train reached the platform. Clark did not *stand* on the blue tactile edge but walked in a fluid and continuous motion from the center of the platform right onto the train tracks into the path of the oncoming train. An internal investigation found the probable cause of the incident to be "imprudent customer actions," not employee negligence. "Willful and wanton misconduct should shock the conscience ***." *Oravek v. Community School District 146*, 264 Ill. App. 3d 895, 900 (1994). The CTA's conduct in this case did not shock the conscience. We find that the willful and wanton conduct counts were properly dismissed.

¶ 43                                    III. CONCLUSION

¶ 44    The trial court did not err in dismissing with prejudice the Pryors' counts for negligence and willful and wanton conduct.

¶ 45    Affirmed.

**No. 1-20-0895**

| | |
|---|---|
| **Cite as:** | *Pryor v. Chicago Transit Authority*, 2022 IL App (1st) 200895 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-L-011593; the Hon. Christopher E. Lawler, Judge, presiding. |
| **Attorneys for Appellant:** | Bryant M. Greening, of LegalRideshare, LLC, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Karen G. Seimetz, Stephen L. Wood, and Irina Y. Dmitrieva, of Chicago Transit Authority, for appellee. |