2025 IL App (1st) 230797

FIFTH DIVISION
March 14, 2025

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-23-0797

| | | |
|---|---|---|
| SHEARAL COLE, as Special Administrator of the Estate of Felon Nicole Smith, Deceased, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | Appeal from the Circuit Court of |
| v. | ) ) | Cook County. |
| THE CHICAGO TRANSIT AUTHORITY; PHILIP HAMILTON, Individually and as Employee/Agent of the Chicago Transit Authority; AGB INVESTIGATIVE SERVICES, INC.; and FABEOUS DOWD, Individually and as Employee/Agent of AGB Investigative Services, Inc., and Agent of the Chicago Transit Authority, | ) ) ) ) ) ) ) | No. 2019 L 008880  Honorable Scott D. McKenna, Judge Presiding. |
| Defendants, | ) ) | |
| (Chicago Transit Authority and Philip Hamilton, Defendants-Appellees). | ) ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Oden Johnson and Mitchell concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff Shearal Cole, as special administrator of the estate of his deceased wife, Felon

Nicole Smith, appeals from the judgment of the circuit court in this wrongful death and survival

action. The circuit court granted summary judgment in favor of the Chicago Transit Authority

(CTA) and its conductor, Philip Hamilton, concluding that no duty of ordinary care was owed to

a trespasser on its railroad tracks, there was no evidence to support a claim that Mr. Hamilton was willful and wanton, and the CTA was neither liable for negligently hiring or training its contracted security guard nor vicariously liable for the guard's actions. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     On August 12, 2019, Mr. Cole brought this wrongful death and survival action, on behalf of his deceased wife's estate, against the CTA, AGB Investigative Services, Inc. (AGB), and both defendants' "unknown employees." Mr. Cole alleged that on the afternoon of June 27, 2019, Ms. Smith dropped her cell phone onto the tracks from the platform at the 69th Street Red Line station and was struck by the northbound train after jumping down from the platform to retrieve it. Mr. Cole alleged that the CTA's train conductor was negligent for failing to maintain a proper lookout, for allowing his attention to be diverted away from the tracks, and for not noticing Ms. Smith in time to stop the train and prevent the accident. He additionally alleged that a security guard working for AGB, who was present at the station, was negligent for failing to alert the rail operator about Ms. Smith's presence on the tracks, for not assisting her, and for abandoning her on the tracks. The lawsuit also included claims of negligent hiring, retention, and training against both the CTA and AGB.

¶ 4     The CTA moved to dismiss the claims against it, arguing that at the time of her death, Ms. Smith was trespassing on the tracks and the CTA, therefore, did not owe her any duty except to refrain from willfully and wantonly injuring her once she was discovered. The CTA also argued that the complaint was deficient because Mr. Cole failed to plead the correct standard of care—the duty to refrain from willful and wanton conduct—and because the security guard was an independent contractor rather than a CTA employee.

¶ 5     In lieu of a response, Mr. Cole filed an amended complaint naming CTA conductor Phillip

Hamilton and AGB canine security guard Fabeous Dowd as additional defendants and adding a count based on Mr. Dowd's willful and wanton conduct. The CTA's motion to dismiss the amended complaint was denied.

¶ 6    At the close of discovery, defendants moved for summary judgment. AGB and Mr. Dowd argued that they did not owe a duty to protect Ms. Smith from her own negligent conduct and did not proximately cause her death. The circuit court denied summary judgment for AGB and Mr. Dowd, finding that there were triable issues of fact regarding their conduct. They are not part of this appeal. The circuit court granted summary judgment to the CTA and Mr. Hamilton.

¶ 7    In their summary judgment motion, the CTA and Mr. Hamilton argued that there was no liability based on Mr. Hamilton's conduct because there is no duty whatsoever owed to a trespasser encountering an open and obvious condition of peril and that the proximate cause of Ms. Smith's death was her own conduct. The CTA and Mr. Hamilton submitted as exhibits video-only footage from the train cab and platform surveillance cameras, which this court has viewed, a certificate of AGB's good standing from the Secretary of State, and the eyewitness depositions of CTA customer Jonathan Artis, Mr. Hamilton, and Mr. Dowd, as well as depositions of the parties' respective experts.

¶ 8    In his deposition, Mr. Hamilton acknowledged that he did not apply the emergency brake when he saw Ms. Smith but explained that he was "in shock" and "thought that [he] did apply the emergency brakes." He also said, "I did the best that I could to stop that full train." After the accident, Mr. Hamilton received counseling and was diagnosed with post-traumatic stress disorder.

¶ 9    In the platform video footage, Ms. Smith is wearing an orange shirt and carrying a white plastic bag. After dropping her phone on the tracks, she turns to speak to an unidentified man on the platform and, together, they look down at her phone. Mr. Dowd, the security guard, begins

walking towards them, with his dog, from the south end of the platform. At 12:38:42 p.m., Ms. Smith lowers herself onto the tracks to retrieve her phone.

¶ 10    After recovering her phone, at 12:38:49 p.m., Ms. Smith makes a quick, unsuccessful attempt to hoist herself back onto the platform. The unidentified man on the platform points out an oncoming train and, seconds later, Mr. Artis, another CTA passenger who was deposed during discovery, enters the frame and points in the same direction. Both bystanders gesture towards the oncoming train, which is in the same direction as Mr. Dowd and a set of egress stairs at the end of the platform. Ms. Smith, holding her cell phone and white plastic bag, begins running towards the south end of the platform, in the direction of the approaching train, where the stairs are located. The train strikes Ms. Smith at 12:39:01 p.m., just before she reaches the end of the platform and 18 seconds after she entered the tracks.

¶ 11    The train cab's internal camera shows Mr. Hamilton enter the train to begin his shift at the previous station and drive the train towards the 69th Street Station. For the first 1 minute and 15 seconds of the trip, Mr. Hamilton alternates between glancing out the train cab's window and at the tracks ahead. One minute and sixteen seconds into the ride, he looks out the window on his right side, towards traffic on the expressway. Mr. Hamilton laughs and makes a hand gesture. He returns his gaze to the tracks ahead 11 seconds later and notices Ms. Smith on the tracks. Mr. Hamilton's expression quickly changes, and he releases the train's controller, which engages the "dead man" brake. He then applies the track brake, bringing the train to a stop in 12.6 seconds.

¶ 12    In response to the motion for summary judgment, Mr. Cole argued that the CTA owed a duty of ordinary care or, at the very least, a duty to refrain from willful and wanton conduct. He argued that whether Mr. Hamilton had engaged in willful and wanton conduct was a question of fact for the jury. According to Mr. Cole, there was no open and obvious danger present when Ms.

4

Smith lowered herself onto the tracks because there was no oncoming train visible at that time, and Mr. Hamilton had a duty to maintain a proper lookout.

¶ 13    Mr. Cole relied, in part, on Mr. Hamilton's testimony that in his 13 years at the CTA, he had encountered people on the tracks approximately 30 or 40 times and the fact that Mr. Hamilton's employment with the CTA was terminated after the accident. A letter dated July 17, 2019, from the CTA to Mr. Hamilton explained that he was being discharged because he violated several internal rules and failed to attend a discharge hearing with CTA management. Specifically, the CTA concluded that Mr. Hamilton violated a rule requiring operators to devote full attention to the proper performance of their duties, be constantly alert for any condition which may cause injury, and be ready to bring their trains to a safe and smooth stop. He was also found in violation of a rule requiring operators to use the emergency brake to stop a train within the shortest possible distance. The letter also noted that Mr. Hamilton, did not operate his train "on sight" at all times, meaning he was unable to bring the train to a stop within half his range of vision if necessary.

¶ 14    Mr. Cole also obtained expert opinions from railroad operations consultant Colon Fulk and collision reconstructionist Daniel Billington. Mr. Fulk testified that the accident was preventable, noting that Mr. Hamilton violated CTA and rail industry standards by failing to maintain a proper lookout when approaching the station. He also stated that Mr. Dowd demonstrated "a reckless and a total disregard for the safety of Ms. Smith" by failing to assist her physically and by not using a call box on the platform to contact the CTA's power control.

¶ 15    Mr. Billington agreed that the accident was preventable. His preliminary accident reconstruction report stated that "the collision would have been entirely prevented if the train operator had maintained a proper lookout." Mr. Billington highlighted Mr. Hamilton's failure to pull the master control handle down to the emergency brake position. He explained that Mr.

Hamilton used only 54% of the train's braking ability and the emergency brake would have nearly doubled the train's deceleration rate. Mr. Billington relied on evidence that CTA trains are equipped with three braking mechanisms: an electric brake (with a deceleration rate of 2.8 miles per hour per second), a friction brake (2.5 mphps), and a track brake (1.5 mphps). The emergency brake engages all three mechanisms at once and is the quickest way to stop a train.

¶ 16    According to Mr. Billington, Mr. Hamilton stopped the train within 327 feet or 12.6 seconds. He opined that, if the emergency brake had been used, the train would have been able to stop within only 177.4 feet. Mr. Billington did not offer an opinion on whether using the emergency brake, rather than the "dead man" brake, after Mr. Hamilton saw Ms. Smith would have prevented the accident. However, he opined that had Mr. Hamilton been paying attention and quickly engaged the emergency brake, the accident would have been avoided.

¶ 17    In reference to Mr. Cole's claims based on Mr. Dowd's conduct, the CTA argued in its motion that (1) AGB was an independent contractor and not an agent, (2) there was no indication that AGB was unfit to deliver security services when the CTA entered into its contract with AGB, and (3) Mr. Dowd's training, or lack thereof, was not the proximate cause of Ms. Smith's death.

¶ 18    The CTA relied on the testimony of Mr. Dowd and two AGB officials: AGB's owner and CEO, John Griffin Jr., and the captain in charge of AGB's canine guard division, Armando Barraza. According to Mr. Griffin, AGB signed a contract with the CTA for canine guard services on April 17, 2019. AGB partnered with International Scent Solutions (ISS) to provide canines and training for its guards and hired Mr. Barraza to lead its new canine division.

¶ 19    Mr. Barraza testified that AGB's human resources department selected personnel for the canine division, ensured proper training, and managed the application process for canine handler authorization cards. According to Mr. Barraza, on the day of the incident, Mr. Dowd was equipped

6

with an AGB radio that could contact his AGB supervisor but not CTA personnel.

¶ 20    In reference to claims based on Mr. Dowd's conduct, Mr. Cole argued that there was sufficient evidence that the CTA was negligent in hiring and training AGB and Mr. Dowd. Mr. Cole relied on a petition for a preliminary injunction filed against the CTA in another case, the month after AGB was hired, which alleged AGB was incapable of performing its contractual obligations to provide security, and the fact that Mr. Dowd did not possess the required canine handler license.

¶ 21    Mr. Cole also relied on Mr. Dowd's deposition testimony. Mr. Dowd testified that he had worked at AGB for three years and been assigned to provide security services at a senior citizen home, Walmart, and concerts. He reported that this incident occurred on his second day of work as a canine guard for AGB, before he received a canine handler authorization card. Mr. Dowd received more than 100 hours of canine training and a one-day rail safety course provided by the CTA in preparation for this assignment. Mr. Dowd's examination following this training, where he had to match photos of hand signals to their meaning, showed that he had crossed out and rewritten answers several times. He received an overall score of 80% on this test.

¶ 22    Mr. Dowd testified that upon discovering Ms. Smith, he asked her what she was doing and told her she could not be on the tracks. He explained that he did not physically assist Ms. Smith because he was instructed to never let go of his dog under any circumstances. After the incident, Mr. Dowd radioed AGB's emergency code to his superior and filled out an incident report at their office. He returned to his previous assignment at Walmart shortly after.

¶ 23    On April 20, 2023, the circuit court granted the CTA's motion for summary judgment. The court found that no duty was owed in this case because the danger of the track and train were open and obvious. If a duty had been owed, however, it would have been to refrain from willful and

wanton misconduct. The court noted that, in his complaint, Mr. Cole used the incorrect standard, alleging that the CTA and Mr. Hamilton were negligent rather than willful and wanton. However, rather than dismiss the complaint or decide the motion based on that omission, the court analyzed Mr. Cole's claims under the willful and wanton standard. The court concluded that the evidence failed to support any claim that Mr. Hamilton's conduct was willful and wanton.

¶ 24 The circuit court primarily relied on footage from the train's interior cab and the testimony of Mr. Hamilton and Mr. Billington. The court noted that Mr. Hamilton was operating the train below the speed limit, became distracted for 12 seconds, and applied the track brake within one second of returning his attention to the tracks in front of him. It concluded: "The evidence presented indicates that—at most—the conduct of Train Operator Hamilton could arguably be negligent if the jury in fact believed, as Plaintiff argues, that Hamilton was inattentive towards the track in front o[f] him and failed to see or react to the decedent's presence on the track in time. As these actions or inaction do not, and cannot, rise to the level of willful and wanton conduct, the CTA and Hamilton could not have breached any duty owed to the decedent."

¶ 25 The circuit court also ruled that there was insufficient evidence to support claims based on theories of both direct and vicarious liability against the CTA for the actions of AGB or Mr. Dowd. Because Ms. Smith was a trespasser, the only duty the CTA owed to her was "to hire AGB and train [Mr.] Dowd while refraining from willful and wanton misconduct in the process." The court reasoned that any deficiencies in Mr. Dowd's canine training could not rise to this level because the accident did not concern the handling of his dog. Additional evidence, such as the CTA passing Mr. Dowd on its safety course, despite evidence of confusion on his test, and Mr. Dowd's admission that, as the accident was unfolding, he was mainly focused on not dropping his dog's leash, may support a finding of negligence but not willful and wanton misconduct. The circuit

court also ruled that there was no question of fact as to the CTA's vicarious liability because the CTA did not hire Mr. Dowd, pay him, or exercise control over his employment, sufficient to establish an agency relationship with him or AGB.

¶ 26    On April 24, 2023, the circuit court made a finding, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), that there was no reason to delay appeal of its ruling granting summary judgment to the CTA and Mr. Hamilton. This appeal follows.

¶ 27                                II. JURISDICTION

¶ 28    The circuit court entered its Rule 304(a) finding on April 24, 2023. Ms. Smith's estate timely filed a notice of appeal on May 3, 2024. We have jurisdiction pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), governing appeals from final judgments as to one or more but fewer than all the parties.

¶ 29                                 III. ANALYSIS

¶ 30    On appeal, Mr. Cole contends that the circuit court erred in granting the CTA's motion for summary judgment. Specifically, he argues (1) the trial court erred in finding that the CTA and its employee Mr. Hamilton owed no duty to someone trespassing on train tracks, (2) there is a genuine issue of material fact as to whether Mr. Hamilton engaged in willful and wanton conduct by failing to maintain a proper lookout of the tracks ahead and failing to engage the emergency brake once a trespasser was discovered, (3) there is genuine issue of material fact regarding whether the CTA is liable for negligently hiring AGB and training Mr. Dowd, and (4) the trial court erred in finding that the CTA is not vicariously liable for the conduct of AGB.

¶ 31    Summary judgment is appropriate where, construed liberally and in favor of the nonmoving party, "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). Summary judgment should be denied and the issue referred to the trier of fact when reasonable individuals could draw different inferences from the undisputed material facts or when there is a genuine dispute over a material fact. *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 424 (1998). A defendant seeking summary judgment bears the initial burden of production, which can be met by either presenting evidence that disproves the plaintiff's case or showing that the plaintiff lacks sufficient evidence to prove an essential element of the claim. *Purtill v. Hess*, 111 Ill. 2d 229, 240-41 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this burden is met, the plaintiff must then provide factual support for the elements of their claim. *Celotex Corp.*, 477 U.S. 317 at 324. Our review of a circuit court's grant or denial of summary judgment is *de novo. Doria v. Village of Downers Grove*, 397 Ill. App. 3d 752, 756 (2009).

¶ 32                    A. The CTA's Liability for Mr. Hamilton's Conduct

¶ 33    The first question is what duty, if any, the CTA and Mr. Hamilton owed to Ms. Smith in this situation. A legal duty refers to a relationship between the defendant and the plaintiff in which the law mandates the defendant exercise a level of care for the plaintiff's benefit. *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 22. Whether a duty exists is a question of law for the court to decide. *Quiroz v. Chicago Transit Authority*, 2022 IL 127603, ¶ 13. Our duty analysis in any negligence case is based generally on four factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. *Id.*

¶ 34    Whatever the standard of care, if it is violated, the CTA would be liable for Mr. Hamilton's actions under the theory of *respondeat superior* because, as the conductor of the train that struck Ms. Smith, he was an employee or agent of the CTA acting within the scope of his employment.

*Gant v. L.U. Transport, Inc.*, 331 Ill. App. 3d 924, 927 (2002).

¶ 35                              1. *The Standard of Care Here is Willful and Wanton*

¶ 36    The CTA owned the land on which this incident occurred. Normally, a landowner, and their agents, owe a duty of reasonable care to those entering their premises. *Quiroz*, 2022 IL 127603, ¶ 14. However, that is not the duty owed in this case for two reasons. First, there is an exception to this duty of reasonable care where the danger is open and obvious. Second, Ms. Smith was a trespasser, which generally means the only duty the landowner owes is to refrain from willful and wanton conduct. *Id.* ¶ 16.

¶ 37    A landowner is generally not obligated to anticipate or guard against injuries resulting from a potentially hazardous condition that is open and obvious. *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 447-48 (1996). The rationale for this limitation is that, when a danger is apparent and easily noticeable, the likelihood of injury is considered minimal—individuals recognize and avoid such obvious risks *Id*. at 448. Whether a particular danger is open and obvious may be a question of law for the court to decide, when appropriate. *Choate*, 2012 IL 112948, ¶ 34.

¶ 38    Conditions are considered open and obvious when they are clear and recognizable to a reasonable person using ordinary judgment. *Deibert v. Bauer Brothers Construction Co.*, 141 Ill. 2d 430, 435 (1990). Our courts have long recognized that a moving train "presents a danger that is so obvious" that even a child should be expected to appreciate it. *Choate*, 2012 IL 112948, ¶ 32.

¶ 39    An open and obvious danger can relieve a landowner of the duty of reasonable care, even to an invitee. In *Park v. Northeast Illinois Regional Commuter R.R. Corp.*, 2011 IL App (1st) 101283 and *McDonald v. Northeast Illinois Regional Commuter R.R. Corp.*, 2013 IL App (1st) 102766-B, the decedents were struck by trains as they attempted to cross at dedicated pedestrian crosswalks. The plaintiffs in those cases were invitees, rather than trespassers, but the courts found

that the potential for injury from an oncoming train was open and obvious and the railroads did not owe a duty of ordinary care.

¶ 40    Here, there was no crossway and the tracks were several feet below the train platform, which meant that Ms. Smith had to jump down to reach them. The platform area was clearly marked and separated from the track area with blue tactile warning strips. A busy highway was across from the tracks and the egress stairs at the end of the platform were closed with a yellow metal gate. Additionally, trains regularly arrive only minutes apart at this station. While we agree with Mr. Cole that the danger is not identical to situations in which passengers have gone onto the tracks when an oncoming train was visible, there can be no question that a reasonable person exercising ordinary perception, intelligence, and judgment would recognize the risk of jumping from the platform area down onto these tracks even if a train was not immediately visible, since trains come frequently and quickly into the area. We agree with the CTA and the circuit court that the tracks constituted an open and obvious danger.

¶ 41    We disagree with the CTA, however, that an open and obvious danger means that it owed no duty to Ms. Smith. As this court made clear in *Pryor v. Chicago Transit Authority*, 2022 IL App (1st) 200895, ¶¶ 40-42, a railroad will still owe a duty to refrain from willful and wanton conduct where the danger of the train is open and obvious. In *Pryor*, the decedent walked directly off the platform and fell onto the tracks where an oncoming train struck and killed him. Before the accident, he urinated on the platform, unsteadily walked around, and rocked back and forth. The court found the moving train to be an open and obvious danger and held that there was no duty *of ordinary care*. *Id.* ¶ 39. The court went on, however, to analyze separately whether the plaintiff had sufficiently pled that the CTA had breached its duty to refrain from willful and wanton conduct. *Id.* ¶¶ 41-42.

¶ 42    In addition to the fact that there was an open and obvious danger, the CTA did not owe Ms. Smith a duty of ordinary care because Ms. Smith was a trespasser. The only duty that a landowner typically owes to a trespasser is to refrain from willfully and wantonly injuring them. *Choate*, 2012 IL 112948, ¶ 25. Trespassers are owed a lesser duty because the law does not require an owner or occupier of land to anticipate the presence of people wrongfully or unexpectedly on their land. *Corcoran v. Village of Libertyville*, 73 Ill. 2d 316, 325 (1978).

¶ 43    Our supreme court reemphasized this point recently in *Quiroz*. In that case, the court affirmed the dismissal of a complaint against the CTA based on a fatal accident involving a person who was struck by a train after he trespassed into a CTA subway tunnel. The supreme court held that because the decedent was a trespasser who had "entered an unauthorized area of the CTA's subway tunnel" the CTA's only duty was to "refrain from willfully and wantonly" injuring him. (Internal quotation marks omitted.) *Quiroz*, 2022 IL 127603, ¶¶ 15-16.

¶ 44    Mr. Cole argues that whether Ms. Smith was an invitee or a trespasser is a question for the jury. He points to *Eshoo v. Chicago Transit Authority*, 309 Ill. App. 3d 831 (1999), where this court held that the question of the decedent's status at the time of injury should have been left to a jury. This court reversed in that case because the trial court had instructed the jury that the passenger/decedent, who was electrocuted on the third rail, remained an invitee, as a matter of law, even after he left the platform. We found that to be clear error. *Id.* at 836. We also noted that there was an absence of clear evidence as to how the decedent ended up on the third rail since none of the witnesses saw him leave the platform. *Id.* at 833. Thus, the decedent's status at the time of the injury was disputed or "different inferences" could be drawn, although we acknowledged that the inference that the decedent was a trespasser was "persuasive" in light of where he was discovered. *Id.* at 836.

13

¶ 45     In contrast, Ms. Smith's actions at the time of her injury were not in dispute but were well documented by the video and by the witnesses. In contrast to *Eshoo*, it was undisputed and documented in this case that Ms. Smith *deliberately* climbed off the platform and onto the track area, leaving no question that she had lost her status as an invitee. As we recognized in *Eshoo*, a passenger lawfully on the platform has no right to "expand the scope of the invitation to include parts of the premises where no one could reasonably argue that he or she was lawfully entitled to be." *Id.* at 836. A CTA ordinance prohibits "entering or remaining upon any track or right-of-way" (Chicago Transit Authority Ordinance No. 16-110 (approved Sept. 14, 2016)), and such ordinances have the force of law (70 ILCS 3605/31 (West 2018). *Quiroz*, 2022 IL 127603, ¶ 15.) Passengers who enter areas that are off limits are trespassers. Our supreme court left no room for an alternative result when, in *Quiroz*, it unequivocally found that an individual on the tracks, in violation of a CTA ordinance, is a trespasser. *Id.*

¶ 46     Mr. Cole argues that even if Ms. Smith was a trespasser, two exceptions to these limitations on landowner duty apply here and required the CTA to exercise ordinary care: deliberate encounter and frequent trespasser. The facts in this case simply do not support the applicability of either of these exceptions.

¶ 47     The deliberate encounter exception applies where the landowner has reason to expect that an invitee will proceed to encounter an open and obvious danger because a reasonable person would conclude that the advantages outweigh the apparent risk. See *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 20. This exception does not apply because, as discussed above, Ms. Smith was a trespasser and not an invitee. Even if she were an invitee, however, the risks of entering the track area were obviously extremely high, and Mr. Cole suggests no reason that the CTA would reasonably anticipate that invitees would ignore those risks.

¶ 48    The frequent trespasser exception would apply only if the CTA was aware of a "constant intrusion." (Internal quotation marks omitted.) *Vega v. Northeast Illinois Regional Commuter R.R. Corp.*, 371 Ill. App. 3d 572, 578 (2007). As the court made clear in *Vega*, after reviewing the cases that had applied this exception and those that had rejected it, reliance on the doctrine of "frequent trespasser" requires evidence of "the existence of a 'beaten' or 'well-worn' path, evidence of a constant intrusion on the railroad's property by pedestrians who had a custom of crossing the right-of-way or tracks and evidence that the railroad knew of and tolerated the circumstance." *Id.* at 581. There was no evidence of any of this here. Mr. Hamilton testified that he had observed trespassers 30 to 40 times over his 13 years working for the CTA, but the fact that he observed a trespasser on average once every four months in no way suggests a "constant intrusion" on railroad property.

¶ 49    Mr. Cole also argues that Ms. Smith was owed a duty of ordinary care as a *discovered* trespasser in a position of imminent peril. This articulation of a duty is set out in section 336 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 336 (1965)), which requires reasonable care where a landowner discovers a trespasser.

¶ 50    Illinois has not adopted this section of the Restatement, and our supreme court made clear in *Quiroz* that the fact that a trespasser is discovered does not change the duty of care owed. *Quiroz*, 2022 IL 127603, ¶ 27. As the supreme court explained, the rule for a discovered trespasser is "indistinguishable from the rule that a landowner owes a trespasser a duty to avoid willfully or wantonly causing injury to the trespasser once aware of his peril." *Id.* ¶ 30 (citing *Chicago Terminal Transfer R.R. Co. v. Kotoski*, 199 Ill. 383, 387 (1902)).

¶ 51    In sum, the only duty that the CTA and Mr. Hamilton owed Ms. Smith was to refrain from willful and wanton conduct. The danger of an oncoming train was open and obvious, and she was a trespasser. No exception to this limitation on landowner duty is applicable here. We consider

next whether Mr. Hamilton's conduct was willful and wanton.

¶ 52    2. *There Was No Question of Fact as to Whether Mr. Hamilton Was Willful and Wanton*

¶ 53    Mr. Cole contends that, if the standard of care in this case is willful and wanton, there is a question of fact as to whether Mr. Hamilton and the CTA engaged in willful and wanton conduct. We do not agree.

¶ 54    Willful and wanton conduct is not a separate tort and is sometimes referred to as aggravated negligence. *Pryor*, 2022 IL App (1st) 200895, ¶ 41. "Willful and wanton conduct is found where an act was done with actual intention or with a conscious disregard or indifference for the consequences when the known safety of other persons was involved." (Internal quotation marks omitted.) *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 429, 451 (1992). Willful and wanton conduct is distinguishable from " 'mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency.' " *Id.* at 449 (quoting Restatement (Second) of Torts § 500 cmt. g, at 590 (1965)). A court may decide whether willful and wanton conduct is present as a matter of law when appropriate. *Pryor*, 2022 IL App (1st) 200895, ¶ 41. As our supreme court made clear in *Quiroz*, the failure to keep a lookout for persons on the track is simply not willful and wanton conduct. *Quiroz*, 2022 IL 127603, ¶ 42.

¶ 55    Mr. Cole points to two different time periods in which he argues a finder of fact could find willful and wanton conduct. One period is in the seconds between when Mr. Hamilton saw Ms. Smith on the tracks and when the train hit her, and the other is in the period before that when he drove towards the station. We conclude that there is no evidence creating an issue of fact as to either of these time periods.

¶ 56    Looking first at the period after Mr. Hamilton saw Ms. Smith, the evidence was undisputed

that he reacted immediately. When he discovered Ms. Smith, his expression immediately changed, and within one second, he released the train's controller, triggering the "dead man" brake, and engaged the track brake, bringing the train to a complete stop within 12 seconds. Mr. Cole's own expert noted, "This response is faster than what we might expect to find in the case of an operator who encounters an unanticipated path intrusion." Mr. Hamilton cooperated with responding emergency personnel and explained in his deposition testimony that he believed he was in shock, thought he had used the emergency brake, and did his best to stop the train as quickly as possible.

¶ 57    Mr. Cole points to evidence that suggests that, if Mr. Hamilton had seen Ms. Smith sooner and if he had pulled the emergency brake immediately, she might have been saved, but this does not support his claim here. As we recognized in *Pryor*, where someone in Mr. Hamilton's position fails to take *all* possible measures to avoid hitting someone on the tracks, " 'including reducing speed, stopping and/or blowing the horn' " this does not, in itself, rise to the level or willful and wanton. *Pryor*, 2022 IL App (1st) 200895, ¶ 42. Mr. Hamilton's failures in this case simply did not rise to the level of willful and wanton conduct.

¶ 58    Mr. Cole cites cases where reckless disregard and thus willful and wanton conduct can be inferred from a failure to rescue a decedent after the defendant learns of his or her impending danger. See, *e.g.*, *American National Bank & Trust Co. v. City of Chicago*, 192 Ill. 2d 274, 285 (2000). But these cases concern emergency medical personnel responding to summonses for help—a context quite different than a trespasser on a railroad track. *Quiroz* makes clear that the CTA and its train operators owe an extremely limited duty of care to trespassers, even after they are discovered. *Quiroz*, 2022 IL 127603, ¶¶ 30-32. The plaintiff in that case alleged that the decedent could have or should have been discovered because he was allegedly visible on security camera and two trains had seen and passed him before he was struck and killed by a third. *Id.* ¶ 3.

The supreme court held that the first two trains had no affirmative duty to rescue trespassers on the tracks and the third train had no duty to maintain a lookout for trespassers on the tracks. *Id.* ¶ 41. The court reasoned that the CTA did not put the decedent in a position of peril. *Id.* ¶ 35. Similarly, here, Ms. Smith chose to lower herself onto the tracks and place herself in a position of peril. Neither the CTA nor its operators owed her a duty to maintain a lookout for her in this unauthorized area or to rescue her from a position of peril that she had put herself in.

¶ 59       Mr. Cole also points to Mr. Hamilton's conduct before Ms. Smith was discovered. One minute and sixteen seconds into his trip, Mr. Hamilton became distracted for eleven seconds. There is no evidence to suggest that his distraction rose beyond "mere inadvertence, incompetence, or unskillfulness." The tragic outcome of this case notwithstanding, the undisputed facts are that Mr. Hamilton was driving below the speed limit and had not yet discovered Ms. Smith. A train operator under no duty to keep a lookout for trespassers is not engaged in willful and wanton misconduct because he becomes distracted and glances away from the tracks for a matter of seconds.

¶ 60       Mr. Cole argues that the circuit court failed to appreciate evidence—namely the CTA's report detailing its internal investigation—supporting a finding of willful and wanton misconduct. Mr. Cole is correct that Mr. Hamilton was determined to have violated several CTA rules, including ones requiring that conductors use the emergency brake in these situations and be able to stop the train within half of their line of sight. But the CTA's internal safety rules do not create tort duties. See *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 233 (1996) (no legal duty to rescue despite the company's protocols that required assistance be administered); *Blankenship v. Peoria Park District*, 269 Ill. App. 3d 416, 422 (1994) (noting that "a legal duty is normally not established through rules *** or internal guidelines" (internal quotation marks omitted)). Mr. Cole relies on the fact that at his deposition Mr. Hamilton characterized the investigation and reason for

his termination as "basically negligence." However, the correspondence from the CTA includes no such conclusion. Rather, it simply informs Mr. Hamilton that his employment is terminated and lists the rules he was found to have violated. Moreover, even if Mr. Hamilton had been fired for negligence, that would not equate with willful and wanton conduct.

¶ 61 Mr. Cole also points to the opinions of his experts, in particular Mr. Fulk's conclusion that Mr. Hamilton's "actions or lack thereof were reckless and a total disregard for the safety of Ms. Smith." But experts are not permitted to opine on legal conclusions such as whether a defendant was "reckless." *People v. Munoz*, 348 Ill. App. 3d 423, 441, (2004). Thus, neither we, nor the circuit court, are bound by or should even consider these conclusions.

¶ 62 B. The CTA's Liability for the Conduct of AGB and Mr. Dowd

¶ 63 1. *Direct Liability for the Negligent Hiring of AGB and Training of Mr. Dowd*

¶ 64 Mr. Cole argues that the circuit court erred in finding the CTA could not be held directly liable for its hiring of AGB and training of Mr. Dowd. Illinois law recognizes a cause of action against an employer for negligently hiring or retaining an employee who is unfit for the job and poses a danger to others. *Van Horne v. Muller*, 185 Ill. 2d 299, 310 (1998).

¶ 65 Mr. Cole's negligent hiring claim, however, fails at the outset. The gist of this claim is that the CTA failed to hire a qualified security company or to adequately train Mr. Dowd to rescue someone, like Ms. Smith, who was in danger of being hit by an incoming train. As discussed above, the CTA owed no duty to rescue Ms. Smith because she was a trespasser in an unauthorized area who put herself at risk of an open and obvious potential injury. *Quiroz*, 2022 IL 127603, ¶ 41. In the absence of a duty to rescue, Mr. Cole's claim that the CTA negligently hired or trained someone to do that rescuing fails. *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 26.

¶ 66 In *Rhodes*, our supreme court considered whether there could be liability for negligence in

a railroad's failure to rescue a trespasser found in its warming house. The court held that there could not be any liability and explained, "The only 'relationship' between the parties is the wholly fortuitous circumstance of the trespasser's unlawful presence on the premises." *Rhodes*, 172 Ill. 2d at 233. The court concluded that the railroad could "not be charged with the duty to take affirmative action to obtain aid." *Id.* at 237. Similarly, in this case, the CTA had no duty to provide security that would aid Ms. Smith. Thus, there is no basis for holding the CTA liable for negligently hiring a company to do that or properly training the company's employees.

¶ 67                    2. *Vicarious Liability for Mr. Dowd's Conduct*

¶ 68     We agree with the circuit court that the CTA could not be vicariously liable for the actions of Mr. Dowd and AGB under a theory of *respondeat superior*. This claim fails because it is clear that Mr. Dowd worked for AGB and not for the CTA. A principal is vicariously liable for the conduct of its employees but not for that of an independent contractor who is not under its control. *Cornejo v. Dakota Lines, Inc.*, 2023 IL App (1st) 220633, ¶ 26.

¶ 69     AGB is a large security company with 1,300 employees across eight states. There is no evidence that the CTA has any ownership interest in AGB, nor is AGB's security service closely related to the CTA's public transportation services. AGB, not the CTA, established its canine services division, hired its own staff, and contracted with ISS to obtain its canines. AGB established training, operating procedures, and scheduling for its canine handlers, including their dress code, work duties, and reporting requirements. AGB's supervisors monitored its employees' performance, not the CTA. Mr. Dowd was not a CTA agent or employee, and the CTA had no potential vicarious liability for his conduct.

¶ 70                              IV. CONCLUSION

¶ 71     The circuit court did not err in granting summary judgment in favor of Mr. Hamilton and

the CTA where (1) defendants owed no duty of ordinary care to a trespasser on the tracks, (2) there was no issue of material fact as to whether Mr. Hamilton's actions were willful and wanton, (3) the CTA could not be liable for failing to train security guards to rescue a trespasser in these circumstances, and (4) the CTA was not vicariously liability for the conduct of a security guard who was not a CTA employee.

¶ 72    For the above reasons, we affirm the circuit court's grant of summary judgment.

¶ 73    Affirmed.

---

*Cole v. Chicago Transit Authority*, **2025 IL App (1st) 230797**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2019-L-008880; the Hon. Scott D. McKenna, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Robert Robertson, of Robertson Duric, and Jeffrey Neslund, both of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Daniel Cummings and Robin Powers, of Rothschild, Barry & Myers LLP, and Kent S. Ray and Irina Dmitrieva, of Chicago Transit Authority, both of Chicago, for appellees. |