2026 IL App (2d) 250231-U
No. 2-25-0231
Order filed March 2, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

GID GROUP, LLC, Plaintiff-Appellant,
v. VILLAGE OF ALGONQUIN, Defendant,
(Christopher B. Burke Engineering, Ltd.,
Defendant-Appellee).

Appeal from the Circuit Court of McHenry County.
Honorable Joel D. Berg, Judge, Presiding.
No. 22-LA-303

JUSTICE MULLEN delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Summary judgment for defendant was proper on plaintiff's negligence claim based on damage to its property by fire that occurred while its water service was interrupted for a nearby construction project, where plaintiff pleaded that defendant was the general contractor on the construction project and directly involved in the interruption of the water service, allegations which were refuted by defendant. Plaintiff failed to amend its complaint and therefore its unpled theory of liability, based upon defendant assertedly breaching a voluntary undertaking as project engineer to assist impacted property owners like plaintiff, could not defeat the motion for summary judgment.

¶ 2    Plaintiff, GID Group, LLC (GID) appeals from an order entering summary judgment in favor of defendant, Christopher B. Burke Engineering, Ltd. (Burke), on count III of GID's amended complaint, which sought recovery under a theory of negligence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     GID's complaint, as amended, alleged that it owned a parcel of improved commercial property (GID's property) in the Village of Algonquin (Village) and that it planned to remodel and open a restaurant in the building on the property. GID alleged that, in 2021, the Village approved GID's permit application and its plans to remodel the building. During the same time frame, the Village was engaged in a construction project adjacent to GID's property. The project included improvements to the Village's municipal water service. According to the amended complaint, Burke was the general contractor for the project. (Burke denied that allegation.) The complaint alleged that, at some point, water service to GID's property was disconnected or shut off "without notice to GID." The amended complaint also alleges that "[u]nbeknownst to GID, there was no water service to the [p]roperty as of July 15, 2002," when a fire started outside the building and spread to the interior. The building's sprinkler system did not function, and the fire caused extensive damage.

¶ 5     The amended complaint consisted of four counts[1]. Count III sought recovery from Burke for negligence, alleging that Burke owed GID "a duty to exercise reasonable care in the performance of [the construction project] to avoid interruption of water service to property owners and users within the Village, including GID." The amended complaint alleged that Burke breached that duty by:

---

[1] Counts I, II, and IV, which sought recovery from the Village for breach of contract and negligence, were later dismissed and are not part of this appeal.

"a. Directing or allowing its employees or subcontractors to disconnect or shut off water service to [GID's] [p]roperty without ensuring or providing for reinstatement of the water service;

b. Otherwise directing or allowing the water service to [GID's] [p]roperty to be disconnected or shut off water [*sic*] without ensuring or providing for reinstatement of the water service; or

c. Otherwise failing to take reasonable steps to ensure the continued provision of water service to [GID's] [p]roperty."

¶ 6 Burke moved for summary judgment. The motion was directed towards refuting the allegations in the amended complaint that it was the general contractor and had disconnected the water at the GID property. Exhibits, attached to its motion included transcripts of various depositions, are summarized below. Attached to the depositions were various documents, which are discussed below.

¶ 7 Robert Mitchard (the Village's public works director during the relevant time) testified that he was familiar with a bike path and water main improvement project undertaken at a roundabout connecting Main Street with Cary Road in Algonquin. He was also aware that the project required the disconnection of water service to GID's property so that the Village could install a new water main. Mitchard believed the service to GID's property was disconnected at the end of October 2021. One of the Village's maintenance workers, Jason Miller, shut the water off at the valve box but did not disconnect the pipes to GID's property. Rather, those pipes were disconnected by Martam Construction (Martam), the contractor. According to Mitchard, Martam employees knocked on doors to notify property owners of the service disruption. However, he did not know

- 3 -

how the owners of vacant property, like GID's property, were notified. He would not expect Burke to participate in the notification process.

¶ 8 Asked to describe Burke's role in the construction project, Mitchard replied, "[Burke] was the designer. They did *** Phase I engineering, Phase II engineering, and Phase III engineering." Asked if the Village has a process for notifying property owners when the Village wants them to update their pipelines for a water connection, Mitchard replied, "The Village doesn't make that determination. That's up to the property owner. We provide service up to the property line. What happens after that is up to the property owner." Mitchard testified that when the new water main was installed, the Village ran a six-inch waterline to GID's property line. He noted that, at one time, the Village required that service for potable water and "fire service" use separate lines. However, by the time the new water main was installed, the Illinois Plumbing Code required the use of a single line to the owner's property line for both types of water service. Property owners were responsible for the pipelines on their property.

¶ 9 Mitchard sent a letter to Igor Gantea (one of GID's owners) dated October 21, 2021, noting that the parking lot for GID's building was scheduled to be resurfaced in the coming weeks. Mitchard recommended that, before the resurfacing, Gantea "hire a plumbing contractor to connect [GID's] water service to the newly installed water service stub under the buildings [*sic*] parking lot." The letter advised Gantea that the Village and the project's contractor were available to meet with Gantea and his contractor to review the location of the water main and the water service stub. The letter further advised Gantea to contact Jeff Mysliwiec at Burke with any questions. Mitchard never heard from Gantea, and he was unaware whether Gantea ever contacted Mysliwiec.

¶ 10 Gantea testified that when GID purchased the property, he opened an account for water service from the Village. Gantea's first contact with someone he believed to be from Burke was

with a man whose name Gantea did not remember. Asked how he knew the person he spoke to was associated with Burke, Gantea replied, "From his conversation." Gantea's "[f]irst conversation" with the man occurred when "they was [*sic*] digging the road," but Gantea did not approximate a date. The man asked if "they" could deposit clay (presumably from the construction project) into a hole on GID's property where a swimming pool had once been located. Gantea agreed. A couple of days later, the man said that they were going to shut off the water for a few days. Gantea testified that this second conversation took place in the autumn of 2021. He was told that "they was [*sic*] upgrading the pipes" and that the water would begin running through the "new pipe" in a couple of days. Gantea understood from the conversation that no action was required on his part "after they installed a new water main on the street or under the street[.]" Gantea continued:

"Q. Did you learn that you needed to install a new six-inch service line and connect it from your building to the main—

A. After two days, the guy from Burke came and say [*sic*] the village would like you to change the pipe from whatever I have, four-inch. And so that's why they—because they—I have two pipes that is [*sic*] going to the building. *** So they would like to have a six-inch, just one, so they can do one hole to the main pipe, whatever, so to go to the building. And he provide [*sic*] us with an estimate, like he said roughly it's going to cost you like 20,000 or something like that he told me."

¶ 11 Asked if he "decide[d] to go with that," Gantea responded, "No. I called the village." He was transferred to "the village engineer or the village architector [*sic*]." Gantea was told that the Village was obligated to reconnect the water to existing customers. Later, the Village called Gantea. Gantea testified that "[the Village] said they would like for me to change *** from three to six." He responded that because he was an existing customer, the Village could not make him

upgrade GID's water system and that he already had approval of the plan to construct a restaurant from the Village. He was then told that replacing the pipes on his property would be advantageous in the future, but that he did not have to do it. Gantea reiterated that the person he spoke with was from the Village. Gantea testified that someone gave him the telephone number for "the site manager or whatever it was called who was in charge." Gantea called the number and asked why GID's water had not been reconnected. Whomever Gantea spoke with said he would contact the Village and "see what's going on." Gantea subsequently received a call from someone at the Village. Gantea explained that he did not want to upgrade the pipes on GID's property. He said, "just connect me back to the existing." The person he spoke to said "okay," leading Gantea to understand that the Village would authorize the contractor to reconnect the water. That conversation took place less than a month after the water was originally disconnected.

¶ 12   Gantea testified that, as of February 2022, the water had not been reconnected. A service connection was scheduled by the Village in March, but nobody came to restore the water service. He went to the village hall to say he "was waiting for the guy" and he admits that someone from the Village told him that his service could not be restored because the line on GID's property was the wrong size.

¶ 13   Gantea further testified that, at some point, the person whom he believed worked for Burke gave him the number of the "main guy" at his company. Gantea called the number and asked why his water had not been reconnected. The person he spoke with said he would contact the Village. Gantea stated that conversation likely took place in November or December 2021.

¶ 14   Cary Fellows (a plumbing inspector employed by the Village) testified at his deposition that he was not aware that the water service to GID's property had been disconnected. Ordinarily, the Village's public works department would notify property owners of temporary service

disruptions associated with construction projects. Fellows was not part of that department. Fellows was familiar with Burke but did not have contact with its employees. During his deposition, Fellows was shown a copy of a memorandum from James Massarelli (a civil engineer employed by Burke) referring to a conversation he had with Fellows and the Village's building supervisor, Craig Arps. According to the memorandum, Arps instructed Massarelli to have the project's contractor, Martam, install a six-inch diameter "tee" for water service to GID's property. The memorandum stated that the tee was installed on December 6, 2021. Fellows testified that he did not recall the conversation but acknowledged that it might have occurred. Fellows added, "[W]e were going under the direction of the third-party plan reviewing company as to the size." Fellows explained that a six-inch fitting was "required by *** the plan review company that we have do our commercial plan reviews." Fellows identified that company as "B&F."

¶ 15    Asked if it "possible" to connect the six-inch diameter tee to a three-inch diameter water line, Fellows responded, "Yes, there is [*sic*] ways of doing it. There is [*sic*] reducing fittings that they can reduce down to." Later, when asked about his understanding of the Village's requirements for connecting water to a commercial property with a sprinkler system, Fellows explained:

"It has to be a sized system. And that's usually done by a third party fire suppression company will come [*sic*] in and do a survey of the building and figure out what size pipe, service pipe they need."

¶ 16    Asked what size service line GID's property would need, given that the property was equipped with a sprinkler system, Fellows replied:

"Well, from what the [*sic*] B&F sent us it was a 6-inch, that's how [Arps] came out to tell them they needed 6-inch service because now the [S]tate requires one service for domestic and fire on the same service for any new service."

- 7 -

¶ 17    Massarelli testified that he was a registered professional engineer employed by Burke as a senior project manager. Burke was the "resident engineer" for the Village's project to renovate the bike path and water main. One of Burke's engineers, Jeffrey Mysliwiec, was responsible for being on-site and ensuring that the project was being built according to the plans and specifications. Massarelli explained that, in the past, water for sprinkler systems and other uses was supplied through separate lines attached to the water main via separate valve units (known as "buffalo boxes") buried at a water customer's property line. However, the requirements had been changed to require a single service line and a single buffalo box for both a building's sprinkler system and other water needs. Massarelli explained that the new requirement was mandated by the state and was designed to prevent water in sprinkler lines from stagnating and introducing contaminants into the main water supply.

¶ 18    Massarelli recalled receiving a phone call in spring 2022 from someone claiming to be the owner of GID's property. Massarelli testified that the caller asked about the water connection to GID's property. Massarelli did not testify to any further details about the conversation. However, he identified a memo he sent to the Village's manager describing the work that was done at GID's property. The memo indicated that, a few months after the December 2021 installation of the service tee on the property, Massarelli was contacted by an individual who identified himself as the owner of GID's property. The caller "disagreed with the upgraded water service size." According to the memo, Massarelli advised the caller that he (Massarelli) was "given direction" by Fellows and Arps and that the caller should contact one of them. Massarelli testified that he was unaware whether anyone else from Burke had conversations with anyone else from GID.

¶ 19    Massarelli testified that either Mysliwiec or someone from the Village's public works department told him that the project's general contractor, Martam, had dumped gravel on GID's

- 8 -

property. Burke was not involved in dumping the gravel. Additionally, Burke never shut off the water to GID's property.

¶ 20     The record on appeal includes a copy of the Village's ordinances governing its water and sewer department. As pertinent here, the ordinances provide:

"In case of making repairs or alterations or constructing new facilities, or for any other reason, the [Public Works] Director reserves the right to shut off the water and keep it off as long as may be necessary to make such repairs, alterations or the construction of new facilities. ***."

¶ 21     The ordinances further provide: "The building service pipe extends from the curb stopcock to the building and shall be installed by the user at his expense. The building service pipe shall be the same size and same material as the water service pipe ***."

¶ 22     In its response to Burke's motion for summary judgment, GID no longer pursued the theory in its amended complaint that Burke owed a duty to "exercise reasonable care in the performance of [the construction project] to avoid interruption of water service to property owners and users within the Village, including GID." Rather, GID relied on a provision of Burke's contract with the Village stating that the services Burke agreed to provide included "[a]nswering *** questions and resolving issues and concerns from impacted property owners." GID argued that "Burke owed a duty to GID to provide answers to questions or concerns brought by GID." According to GID, "Burke ignored GID's concerns about not being connected to the new water main," with the result that GID's sprinkler system did not function when its building caught on fire.

¶ 23     The trial court granted Burke's motion for summary judgment, and GID filed a timely notice of appeal.

¶ 24                                    II. ANALYSIS

¶ 25    We review a grant of summary judgment *de novo. Sciarrone v. Village of Island Lake*, 2025 IL App (2d) 240153, ¶ 9. Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). "The rules of form and substance that govern pleadings, depositions, admissions, and affidavits in the summary judgment context (for example, Rule 191(a)) help to ensure that the facts and opinions presented to the court will be admissible at trial, thereby allowing the court to determine whether a trial is actually warranted." *Essig v. Advoc. BroMenn Med. Center.*, 2015 IL App (4th) 140546, ¶ 88. "Evidence, such as hearsay, that is inadmissible at trial, may not be considered in support of or in opposition to a summary judgment motion." *Lacey v. Perrin*, 2015 IL App (2d) 141114, ¶ 52.

¶ 26    "A defendant seeking summary judgment bears the initial burden of production, which can be met by either presenting evidence that disproves the plaintiff's case or showing that the plaintiff lacks sufficient evidence to prove an essential element of the claim." *Cole v. Chicago Transit Authority*, 2025 IL App (1st) 230797, ¶ 31. If the defendant satisfies this burden, "the plaintiff must then provide factual support for the elements of their claim." *Id.*

¶ 27    In addition, a plaintiff may not resist summary judgment by asserting factual allegations that do not appear in its complaint. *Abramson v. Marderosian*, 2018 IL App (1st) 180081, ¶ 55. This is so because, for summary judgment purposes, " 'the pleadings *** determine the issues in controversy' " *Id.* (quoting *Filliung v. Adams*, 387 Ill. App. 3d 40, 51 (2008)). Thus, " '[i]f a plaintiff desires to place issues in controversy that were not named in the complaint, the proper course of action is to move to amend the complaint.' " *Id.* (quoting *Filliung*, 387 Ill. App. 3d at 51).

¶ 28　　GID sought recovery from Burke under a theory of negligence. "The elements of a negligence cause of action are a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach." *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 294 (2000) (citing *Cunis v. Brennan*, 56 Ill. 2d 372, 374 (1974)). We begin our analysis by considering the duty element. Our supreme court has recognized that "[t]he concept of duty in negligence cases is involved, complex, and nebulous." *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 17. In determining whether the defendant owed a duty to the plaintiff, courts often consider four factors: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Id.* ¶ 18. "Whether a duty exists in a particular case is a question of law for the court to decide." *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 14, quoting *Marshall v. Burger King Corp.,* 222 Ill. 2d 422, 430 (2006).

¶ 29　　An affirmative duty of care can arise as a result of a voluntary undertaking. In this respect, Illinois follows sections 323 and 324A of the Restatement (Second) of Torts (Restatement (Second) of Torts §§ 323, 324A (1965)). *Claimsone v. Professional Property Management, LLC.*, 2011 IL App (2d) 101115, ¶ 21. Section 323, which applies when the undertaking is for the injured party, provides:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm, or

- 11 -

(b) the harm is suffered because of the other's reliance upon the undertaking." Restatement (Second) of Torts § 323 (1965).

¶ 30    Section 324A, which applies when the undertaking is for one other than the injured party, provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965).

¶ 31    Additionally, the scope of duty of an engineer, as an element of negligence, is circumscribed by the terms of its contract. *Thompson v. Gordon*, 241 Ill. 2d 428, 450 (2011). The contract in this case between the Village and Burke encompasses construction engineering consulting services, and contains a section describing Scope of Services, which include 47 bullets describing expected activities under six topics. Topic number 3 is entitled "3. Construction Observation," which included three sub-topics: LAYOUT VERIFICATION AND/OR CONSTRUCTION LAYOUT; CONSTRUCTION OBSERVATION; TRAFFIC CONTROL INSPECTION. The sub-topic CONSTRUCTION OBSERVATION contained ten bulleted items, including: "Answering of questions and resolving issues and concerns from impacted property owners."

¶ 32    With these principles in mind, we consider whether summary judgment in favor of Burke was proper. In GID's amended complaint, Burke's duty was predicated on the allegation that Burke was the general contractor for the Village's public works project. The summary judgment record is clear, however, that Burke was a civil engineering firm; Martam was the general contractor. Martam disconnected the water at GID's parcel. Accordingly, GID cannot prevail on the theory pleaded in its amended complaint: that Burke breached "a duty to exercise reasonable care in the performance of [the construction project] to avoid interruption of water service to *** GID." Burke's responsibilities included designing the project and providing some oversight. GID did not allege that Burke failed to exercise due care in the design of the project, which—it is undisputed—conformed to regulatory requirements for the size of pipes. Also undisputed is that the extended interruption of water service to GID's building was the result of GID's failure to install a service line on its property that was compatible with the Village's equipment, as required by the Village's ordinance.

¶ 33    In its response to Burke's motion for summary judgment, GID introduced a new theory of duty and breach based on facts not pleaded in its amended complaint. GID claimed that, as a result of its contract with the Village, Burke was "obligated *** to answer questions and resolve issues or concerns from impacted property owners, such as GID." GID's argument fails for the fundamental reason that it is based on facts (namely, Burke's alleged obligations to third parties under its contract with the Village and its alleged failure to provide information to plaintiff) and issues not raised in the pleadings. GID's amended complaint did not include a copy of Burke's contract with the Village or refer to any provisions of the contract germane to its new theory of liability.

- 13 -

¶ 34 As the court in *800 S. Wells Commercial LLC v. Cadden*, 2018 IL App (1st) 162882, ¶ 43, has recently observed: "it is axiomatic that summary judgment motions are limited to the issues raised in the complaint, and a plaintiff cannot raise new issues not previously pled in its complaint in order to obtain, or defeat a motion for, summary judgment." A response to a motion for summary judgment is just not the proper vehicle to assert new factual allegations and legal theories. *Abramson v. Marderosian*, 2018 IL App (1st) 180081, ¶ 55. As *Filliung v. Adams*, 387 Ill. App. 3d 40, 51 (2008), explained "[w]hen ruling on a motion for summary judgment, the trial court looks to the pleadings to determine the issues in controversy. [Citation.] If a plaintiff desires to place issues in controversy that were not named in the complaint, the proper course of action is to move to amend the complaint. [Citation.]." *Abramson* affirmed the grant of summary judgment where, as here, the plaintiff responded to the motion by arguing a new and unpled legal theory. *Abramson*, 2018 IL App (1st) 180081, ¶ 55. Therefore, summary judgment in favor of Burke was proper.

¶ 35 On appeal, GID expands on this new theory, but even if the new theory were properly before us, it would fail. Though GID cites to section 323 of the Restatement (Second) of Torts that section does not concern liability to a third party for a negligently performed voluntary undertaking (see Restatement (Second) of Torts § 323 (1965)), and GID's paraphrase of it inaccurately cobbles together portions of both section 323 and 324A, the latter of which *does* concern liability to third parties.

¶ 36 In any event, GID's argument on appeal is that Burke breached its duty to resolve GID's problem with reconnecting its water because Gantea "was owed clarity as to whether his building was subject to" the village code, which GID concedes "places the onus upon the [water customer seeking connection] to bring their system into compliance…." GID asserts "[t]his case hinges upon

[Gantea], to his detriment, relying on James Massarelli to follow through and provide him with a conclusive answer as to the party responsible for the water pipe upgrade."

¶ 37 The facts are disputed as to what Massarelli said and when he said it. Gantea testified he spoke with "the site manager or whatever it was called who was in charge," and asked why GID's water had not been reconnected. Whomever Gantea spoke with said he would contact the Village and "see what's going on." He testified that conversation took place in "2021, most likely November or December, something like that." On the other hand, Masserelli's memo related that he had a phone call with the owner of the GID property in the spring of 2022. The owner "disagreed with the upgraded service size", and Massarelli told him to contact Cary Fellows (the Village's plumbing inspector) and Craig Arps (the Village's building supervisor). This dispute is not material, however. *Wolinsky v. Kadison*, 2013 IL App (1st) 111186, ¶ 52 ("factual disputes do not preclude summary judgment where the disputed facts are not material to the essential elements of the cause of action or defense").

¶ 38 We will assume Massarelli failed to call Gantea back and unambiguously inform him that installing a conforming service line was a legally required condition for having its water restored, not merely an optional upgrade to its system as GID contends the Village had indicated. Burke's duty, as an element of negligence, is circumscribed by the terms of its contract. *Thompson*, 241 Ill. 2d at 450. The contract called for Burke to answer "questions and resolv[e] issues and concerns from impacted property owners," not give legal advice.

¶ 39 But if clarity and conclusiveness was desired, Gantea admissions at his deposition provide it. He testified that in March 2022 he personally spoke with someone from the village the day he waited for "the guy to come to connect the service" and he was told his water could not be connected because his pipe was a different size than the main connection. He spoke again with

people at the village hall one month before the July 2022 fire and "[t]hey tell me the same, nothing they can do." All of this was consistent with his conversation with a person he identified as a Burke representative two days after his water had been disconnected in the fall of 2021. He was told that he needed to "change the pipe from whatever I have … they would like to have a six-inch …pipe. And he provide us with an estimate, like he said roughly it's going to cost you like 20,000." As the trial court pointed out in its ruling, "[Burke's] duty can only be defined by the contract here and you cannot expand it beyond the contract. So your claim is their duty is to answer basic questions. They answered basic questions. Your client didn't like the answer."  The undisputed facts show Burke did not breach any duty to GID nor was it liable for property damage from the fire.

¶ 40    Accordingly, the trial court did not err in granting summary judgment as there was no genuine issue of material fact, and Burke was entitled to judgment as a matter of law.

¶ 41                                 III. CONCLUSION

¶ 42    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 43    Affirmed.